PEOPLE v OLIPHANT

Docket No. 55781. Argued January 8, 1976 (Calendar No. 6).—Decided
      December 31, 1976.

Charles Oliphant was convicted by a jury in Ingham Circuit
   Court, Donald L. Reisig, J., of rape and gross indecency. The
   defendant challenged the jury array on the first day of trial
   because it excluded all persons between the ages of 18 and 21,
   despite the change in the age of majority which had taken
   effect. Evidence of three prior rapes alleged to have been
   committed by the defendant was admitted over the defendant's
   objection to show intent, motive, scheme, plan, or system to
   arrange the circumstances surrounding them to make it appear
   that the complainant consented. The defendant had been prose-
   cuted for two of these and acquitted. The Court of Appeals,
   Quinn, P. J., and Danhof and Allen, JJ., affirmed (Docket No.
   14975). Defendant appeals. *Held:*

   1. The similarities in the evidence of the four episodes tend
   to show a plan or scheme to make it appear that ordinary
   social encounters which culminated in voluntary sexual inter-
   course had occurred so that the complainant could not show
   her nonconsent. The statute does not require that the evidence
   of similar acts directly tend to prove an essential element of
   the people's case.

   2. A court, in determining whether evidence is inadmissible
   because its probative value is substantially outweighed by its
   unfairly prejudicial effect, must balance many factors, includ-
   ing: the time necessary for presenting the evidence and the

REFERENCES FOR POINTS IN HEADNOTES
[1–3, 6, 7] 75 Am Jur 2d, Trial §§ 416, 417.
[2, 7, 11, 14, 17–22, 25, 26] 65 Am Jur 2d, Rape § 70 *et seq.*
   Admissibility, in prosecution for sexual offense, of evidence of other
      similar offenses. 77 ALR2d 841.
[3, 6, 7, 11, 17–22, 26] 29 Am Jur 2d, Evidence § 339 *et seq.* .
[4–7, 14, 20, 21] 65 Am Jur 2d, Rape §§ 91, 92.
[8–11, 15, 16, 23–25] 21 Am Jur 2d, Criminal Law §§ 165, 166.
[8, 9, 23] 46 Am Jur 2d, Judgments § 397.
[12] 21 Am Jur 2d, Criminal Law § 449.
[13] 47 Am Jur 2d, Jury §§ 215, 227.

potential for delay; how directly it tends to prove the fact in support of which it is offered; whether it would be a needless presentation of cumulative evidence; how important or trivial the fact sought to be proved is; the potential for confusion of the issues or misleading the jury; and whether the fact can be proved in another way involving fewer harmful collateral effects.

3. The testimony by the complainant and the defendant was in substantial agreement on what happened before a change in the defendant's demeanor and his threats. There is, however, directly contradictory testimony on the key issue of consent. Evidence of a plan to orchestrate events to make it appear that complainant consented, along with evidence of the other circumstances surrounding the intercourse, is both relevant and material to the issue of consent and, therefore, properly admissible under the statute. On these facts, the trial court did not abuse his discretion in concluding that the probative value of the evidence was not substantially outweighed by the potentially unfair prejudicial effect, and properly limited the testimony by the exclusion of certain matters which he concluded were too inflammatory and of too little probative value.

4. An issue of ultimate fact litigated in favor of a defendant in one trial cannot be relitigated in a subsequent trial for an offense arising out of the same transaction because collateral estoppel is incorporated in the Fifth Amendment's guarantee against double jeopardy. Collateral estoppel as embodied in the Fifth Amendment, however, does not preclude the receipt into evidence of testimony which is material to establishing the crime charged simply because it was offered and received in a prior trial on a totally distinct matter where the defendant was acquitted.

5. The defendant challenged the jury array on the first day of trial on the basis that no persons between the ages of 18 and 21 appeared on it although the basis for objection had been apparent for some time. The objection was not timely and the jury verdict will not be disturbed for it.

Affirmed.

Chief Justice Kavanagh dissented on the ground that the issue is not whether the *appearance* of consent was created, but whether *in fact* consent was given. Evidence of the defendant's prior alleged rapes of other women at other times could never be material to the issue of this complainant's consent. The fact that one woman was raped has no tendency to prove that another woman did not consent. It is anomalous to permit witnesses to testify that the defendant did rape them when a

jury had determined that he did not in two of the cases and charges were never filed in the third. The juries that acquitted the defendant of rape in the previous cases were the sole judges of the credibility of those complaining witnesses. The double jeopardy clause prohibits the state from relitigating, for any purpose, an issue which was determined in a prior prosecution of the same party.

Justice Levin dissented in a separate opinion. The Court's opinion fails to state a principled basis for an exception to the general rule against the admission of evidence of other crimes. The evidence that the defendant is a rapist is inadmissible to prove a trait of character or propensity to commit the offense charged in support of an inference that he raped or may have raped the complainant. Nor is it probative on the issue of nonconsent: it shows what may have occurred if the woman did not consent, but it does not tend to show whether the complainant consented uninfluenced by force. The evidence that the defendant pursued women in a conventional pattern of consensual social relationships does not tend to establish that he acted in accordance with a plan, or if a plan is perceived, that its purpose was to persuade the jury, not the woman, or to make non-consent difficult to prove. Since no inference adverse to the complainant *i.e.,* that she consented to intercourse, results from the consensual format of her relationship with the defendant, there is no basis for allowing evidence to rebut such an inference even if the format were "orchestrated". The difficulty in obtaining a conviction in such a case can be explained as plausibly by the composition of juries and the values the jurors bring to the intrinsically subjective evaluation of the defendant and the complainant as by the orchestration of events to give the appearance of consent.

The admission of the testimony of the complaining witnesses in the prior prosecutions which had resulted in acquittal is a violation of the rule incorporated in the Double Jeopardy Clause prohibiting relitigation of the same facts. To limit this rule to relitigation of a factual issue in a subsequent trial for an offense arising out of the same transaction virtually eliminates the doctrine of collateral estoppel in criminal prosecutions in this state because all offenses arising out of the same transaction must be tried together.

52 Mich App 242; 217 NW2d 141 (1974) affirmed.

OPINION OF THE COURT

1. EVIDENCE—MATERIALITY—WORDS AND PHRASES.

Materiality looks to the relation between the propositions for

which the evidence is offered and the issues in the case; what is "in issue" or within the range of the litigated controversy is determined mainly by the pleadings read in the light of the rules of pleading and controlled by the substantive law.

2. CRIMINAL LAW—EVIDENCE—SIMILAR ACTS—SCHEME, PLAN, OR SYSTEM.

The statute which permits introduction of evidence regarding a defendant's scheme, plan, or system in committing a criminal act does not require that evidence of similar acts directly tend to prove an essential element of the people's case to be admissible (MCL 768.27; MSA 28.1050).

3. CRIMINAL LAW—EVIDENCE—PREJUDICIAL EFFECT.

A court, in determining whether evidence is inadmissible because its probative value is substantially outweighed by its unfairly prejudicial effect, must balance many factors including: the time necessary for presenting the evidence and the potential for delay; how directly it tends to prove the fact in support of which it is offered; whether it would be a needless presentation of cumulative evidence; how important or trivial the fact sought to be proved is; the potential for confusion of the issues or misleading the jury; and whether the fact can be proved in another way involving fewer harmful collateral effects.

4. RAPE—CONSENT—PHYSICAL RESISTANCE.

The fact of nonconsent is crucial in a prosecution for rape, but a failure to physically resist rape to the utmost is excused if the complainant's will was overcome by fear of the defendant (MCL 750.520; MSA 28.788).

5. RAPE—CONSENT—EVIDENCE.

An act of sexual intercourse forced upon an unwilling woman is no less rape because the behavior of the defendant had for the greater portion of his encounter with the complainant been friendly and nonthreatening (MCL 750.520; MSA 28.788).

6. RAPE—CONSENT—EVIDENCE.

Evidence of a defendant's plan to orchestrate events to make it appear in a trial for rape that a woman consented to sexual intercourse is not conclusive proof that the woman did not consent, but such evidence is both relevant and material to the issue of consent.

7. RAPE—EVIDENCE—SIMILAR ACTS.

Testimony in a prosecution for rape regarding the similar conduct of the defendant on prior occasions and in conditions

similar to those of the crime with which defendant was charged was both relevant and material on the issue of consent where it tended to prove that complainant became the object of defendant's plan to orchestrate circumstances in such a way that subsequent sexual acts might later be viewed as consensual if she did not voluntarily submit (MCL 768.27; MSA 28.1050).

8. CONSTITUTIONAL LAW—DOUBLE JEOPARDY—COLLATERAL ESTOPPEL.

An issue of ultimate fact litigated in favor of a defendant in one trial cannot be relitigated in a subsequent trial for an offense arising out of the same transaction because collateral estoppel is incorporated in the Fifth Amendment's guarantee against double jeopardy (US Const, Am V).

9. CONSTITUTIONAL LAW—DOUBLE JEOPARDY—COLLATERAL ESTOPPEL.

Collateral estoppel as embodied in the Fifth Amendment does not preclude the receipt of testimony material to establishing a crime simply because it was offered and received in a prior trial on a totally distinct matter where the defendant was acquitted (US Const, Am V).

10. CONSTITUTIONAL LAW—DOUBLE JEOPARDY—WORDS AND PHRASES.

Double jeopardy arises when there is relitigation of the same facts from the same transaction (US Const, Am V).

11. RAPE—EVIDENCE—SIMILAR ACTS—ADMISSIBILITY—COLLATERAL ESTOPPEL.

Testimony, in a prosecution for rape, by the complainants in earlier prosecutions for rape in which the defendant had been acquitted, offered to show the defendant's scheme, plan, or system in committing the rape, was not inadmissible under the doctrine of collateral estoppel.

12. CRIMINAL LAW—COMPETENCE—NUNC PRO TUNC HEARING—DUE PROCESS.

A *nunc pro tunc* hearing on competency to stand trial ordered by the Court of Appeals did not violate a defendant's right to due process of law and to a fair trial; whether or not a *nunc pro tunc* competency hearing may satisfy due process requirements depends on the facts of each case.

13. CRIMINAL LAW—JURY ARRAY—AGE OF MAJORITY ACT—OBJECTION.

An objection to a jury array on the basis that no persons between the ages of 18 and 21 appeared on it although the Age of Majority Act was effective prior to trial, which was raised on the first day of trial, was not timely where the basis for

objection had been apparent for some time (MCL 600.1354, 722.52; MSA 27A.1354, 25.244[52]).

DISSENTING OPINION
KAVANAGH, C. J., and LEVIN, J.

14. RAPE—CONSENT—EVIDENCE—SCHEME, PLAN, MOTIVE—MATERIAL-ITY.

*Scheme, plan, motive, modus operandi, and so on, of a defendant charged with rape, in committing alleged prior rapes can never be material to the question of whether consent was given in the case charged; the fact that one woman was raped has no tendency to prove that another woman did not consent.*

15. CRIMINAL LAW—CONSTITUTIONAL LAW—DOUBLE JEOPARDY—COL-LATERAL ESTOPPEL.

*It is fundamentally unfair and totally incongruous with basic concepts of justice to permit the sovereign to offer proof that the defendant committed a specific crime which a jury of that sovereign has concluded he did not commit; otherwise, a person could never remove himself from the blight and suspicious aura which surround an accusation that he is guilty of a specific crime.*

16. CRIMINAL LAW—CONSTITUTIONAL LAW—DOUBLE JEOPARDY—COL-LATERAL ESTOPPEL.

*The double jeopardy clause, which includes the doctrine of collateral estoppel, prohibits the state from relitigating, for any purpose, an issue which was determined in a prior prosecution of the same party; there is no difference between relitigating an ultimate fact or an evidentiary fact: relitigation of either is prohibited.*

DISSENTING OPINION
LEVIN, J.

17. CRIMINAL LAW—EVIDENCE—SIMILAR ACTS—ADMISSIBILITY.

*Evidence tending to show that a defendant committed an offense not charged in the information is not admissible, by long-established judicial policy, for the purpose of showing his criminal disposition or a character trait or propensity to commit that offense to support an inference that he committed the offense charged.*

18. CRIMINAL LAW—EVIDENCE—SIMILAR ACTS—ADMISSIBILITY—PREJU-DICIAL EFFECT.

*Admission of evidence that a defendant committed an offense not charged in the information as tending to establish an element of the offense charged or to negative a defense is subject to the*

power of the court to bar such evidence where the probative value is outweighed by the likelihood that it will unduly prejudice the jury against the defendant, preventing an objective determination of the disputed factual issues.

19. RAPE—EVIDENCE—SIMILAR ACTS.

Evidence that a defendant charged with rape is a rapist is inadmissible to prove a character trait or propensity to commit the charged offense to support an inference that he may have raped the complainant; such evidence, while probative of a propensity to use force to have sexual intercourse if advances are resisted, is indistinguishable from what may not be proven, propensity to rape.

20. RAPE—EVIDENCE—CONSENT—SIMILAR ACTS.

A man's propensity to use force to have sexual intercourse if his advances are resisted is not probative of non-consent of a complainant in a trial for rape; it shows rather how he may react or what may occur if the woman does not consent.

21. RAPE—CONSENT—SOCIAL RELATIONSHIP—PATTERN.

A social relationship of the complainant in a rape case with the defendant does not support an inference that the complainant consented to sexual intercourse or that there was an appearance of consent; nor does a pattern of consensual relationships tend to establish that the defendant acted in accordance with a plan, or even if there was a plan, there is no objective basis to conclude it was intended to hinder effective prosecution.

22. RAPE—APPEAL AND ERROR—EVIDENCE.

The Supreme Court should not uncritically yield to an assumption implicit in the contention in a rape case that the consensual format of the defendant's social relationships with women unduly hindered prosecution; it is the Court's duty to preserve the adjudicative process and safeguards designed to assure all persons a fair trial against being overrun by a juggernaut of felt concern to facilitate a result perceived to be just in a particular case.

23. ESTOPPEL—COLLATERAL ESTOPPEL—WORDS AND PHRASES.

"Collateral estoppel" means that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the parties in any future lawsuit.

24. CONSTITUTIONAL LAW—DOUBLE JEOPARDY.

The Double Jeopardy Clause is a guarantee that the state with

*all its resources and power shall not be allowed to make repeated attempts to convict an individual of an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity.*

25. CONSTITUTIONAL LAW—DOUBLE JEOPARDY—SIMILAR ACTS—COLLATERAL ESTOPPEL.

*It is fundamentally unfair and totally incongruous with our basic concepts of justice to permit the sovereign to offer proof that a defendant committed a specific crime which a jury of that sovereign, in another trial, has concluded he did not commit; otherwise, a person could never remove himself from the blight and suspicious aura which surrounds an accusation that he is guilty of a specific crime.*

26. RAPE—EVIDENCE—SIMILAR ACTS—WITNESSES—CREDIBILITY.

*Evidence that a defendant charged with rape raped three women other than the complainant does not tend to show that the complainant is a credible witness or that the defendant is not.*

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Raymond L. Scodeller,* Prosecuting Attorney, *Lawrence J. Emery,* Assistant Prosecuting Attorney, and *James R. Ramsey,* Special Assistant Prosecuting Attorney, for the people.

*State Appellate Defender Office* (by *Steven L. Schwartz, Terence R. Flanagan* and *Susan J. Smith)* for defendant.

RYAN, J. Defendant, after one mistrial due to jury disagreement, was convicted on charges of forcible rape, MCLA 750.520; MSA 28.788, and gross indecency, MCLA 750.338b; MSA 28.570(2). After the convictions were affirmed[1] defendant was granted leave to appeal by this Court[2] so that we might consider the issues raised. Following a brief recitation of the facts, we will discuss the issues in

[1] 52 Mich App 242; 217 NW2d 141 (1974).
[2] 393 Mich 780 (1974).

the order in which they were briefed by the parties.

Complainant, a Michigan State University student, met defendant while window-shopping on June 1, 1971 and agreed to accompany him to a nearby bar where they could talk. The topics included race, racial prejudice and marijuana. Later she agreed to ride in his car to a place with a band where they might dance. Defendant drove complainant to one bar which was closed, a second where complainant was denied admission because of her age, and a third which did not have a band. During this time period defendant also made three stops at gas stations and one at a car wash. Complainant first indicated her desire to return to her dormitory as they drove away from the closed bar. Defendant, however, insisted on stopping at the other places. Throughout the evening the inside door handle on the passenger side of defendant's car was missing and complainant could leave the car only by rolling down the window and opening the door from the outside.

At this point the testimony of complainant and defendant diverge. Complainant testified that defendant drove to an unfamiliar section of the city, instructing complainant not to "go for the door" and told her to sit on the console near him so they would look like boyfriend and girl friend. She testified to a change in his demeanor; that from being friendly, defendant suddenly became threatening and demanding. She testified: "He said if I didn't do what he wanted * * * he had a gun or knife in the car and that he could take care of me with it." Defendant parked the car in a secluded area and by means of further threats, forced complainant to remove her undergarments and engage in various sexual acts, including intercourse.

Complainant testified that while defendant said he had a weapon, she never saw one and that defendant did not strike her or tear her clothes. Complainant testified that after intercourse she was allowed to replace her clothing and was driven back to her dormitory. On the way, defendant told her that she shouldn't prosecute him, that she could never prove rape, and that he had a tape recorder in the car. Though she was asked to sign a paper saying she would not prosecute, this never occurred. While she was getting out of the car, defendant again warned her not to prosecute and then said, "be sure and get the license plate of the car." Upon returning to her dormitory room, the campus police were called and complainant was taken to the University health center where an examination revealed evidence of recent intercourse.

Defendant, testifying in his own behalf, admitted he had engaged in acts of fellatio and intercourse with the complainant, but stated she had consented. Defendant denied that he threatened complainant or forced her in any way. After dropping complainant off at her dormitory, defendant went to the East Lansing State Police station and stated that, after engaging in sex, he had told complainant that she had an unpleasant body odor, that she had become angry, and that he was apprehensive as to what she might do. Defendant was in the police station when the report of the alleged rape came in.

In attacking complainant's claim that she did not consent to intercourse, the defense counsel elicited testimony which emphasized the fact that complainant was not forced to enter defendant's car, that she did not attempt to flee from defendant as they drove from nightspot to nightspot, that

she was not beaten nor her clothes torn, that no weapon was displayed, that she did not kick or bite defendant. The fact that defendant presented himself at the police station on the night in question, stating that he had had an argument with complainant and was apprehensive as to what she might do, was also argued to be inconsistent with rape.

In rebuttal, the people brought on three witnesses who testified that they had also been raped by defendant under circumstances in many respects similar to those in which complainant was allegedly raped. The substance of their testimony is discussed hereinafter.

I

The first question presented is whether the trial court committed reversible error in allowing into evidence the testimony concerning the three alleged prior rapes to prove the defendant's scheme, plan or system in raping the complainant. The people offered the testimony of the three witnesses pursuant to MCLA 768.27; MSA 28.1050 which reads:

"In any criminal case where the defendant's motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing an act, is material, any like acts or other acts of the defendant which may tend to show his motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing the act, in question, may be proved, whether they are contemporaneous with or prior or subsequent thereto; notwithstanding that such proof may show or tend to show the commission of another or prior or subsequent crime by the defendant."

Past decisions of this Court have upheld the

statute's validity.[3] Defendant challenges the applicability of the statute in his case where the only contested issue is consent. The people contend that the defendant had a sophisticated scheme, plan or system whereby, should his advances meet resistance, he would commit rape while orchestrating the circumstances so as to preclude his victims from proving their nonconsent.

## A

First, we must determine whether the acts of rape testified to reveal a plan or scheme to arrange the circumstances surrounding the episodes in such a way as to make it appear that the victim consented. A brief summary of the testimony of the three witnesses follows.

Witness "A" testified that on the morning of December 24, 1970, she was walking to work. When approximately one mile from her destination, defendant stopped his car and offered her a ride. Because it was cold, "A" accepted the ride and there was friendly conversation about the weather. Upon reaching Eberhard's food store parking lot, "A's" destination, defendant insisted "A" accompany him on a short errand to get some marijuana. Though "A" said she didn't have time because she had to go to work, defendant convinced her. The atmosphere was still friendly.

After driving for a short time and further conversation about marijuana, defendant stopped the car, reached across "A" and pulled off the inside door handle on the passenger side of the car. Defendant then crudely stated his intention to have intercourse with "A". "A" testified that de-

---

[3] *See People v Kelly,* 386 Mich 330, 334; 192 NW2d 494, 498 (1971), and cases cited therein.

fendant told her not to do anything to make him
angry and to do as he ordered or he would "hurt"
her, "shoot" her, and "kill" her. "A" could not
leave the auto after defendant had suddenly be-
come threatening and demanding, because the
door handle had been removed. He asked her if
she had ever dated a black man and she told him
yes.

· "A" was ordered to lie on the floor in the back of
the car and take off her slacks and underwear
while defendant continued to drive. Defendant
then parked the car, removed his pants, and
moved into the back seat. He had intercourse with
"A" and then told her to replace her clothing and
get back into the front seat. During the entire
episode "A" was not struck or beaten, nor did she
ever see a weapon, though the threats of harm
were repeated.

Defendant stated he would drive her back to
Lansing to her original destination. On the way,
while still in the countryside, the car apparently
ran out of gas. Defendant began to walk to a farm
house. When alone, "A" searched the glove com-
partment for a gun, found none, and left the car
and ran to a road commission truck to get help.
The men from the road commission took "A" to
the state police who, in turn, took her to a hospital
for examination. No complaint was ever filed.

Witness "B" testified that she was a student at
Michigan State University. On February 1, 1971
she was hitchhiking on Grand River Avenue to
meet a friend in Okemos and look for a job.
Defendant and another male picked her up in
defendant's car and told her they would take her
where she wanted to go. Conversation was friendly
and touched the subjects of marijuana, defendant's
job, and white women dating black men. Defend-

ant also told "B" that he could get her a job and he would take her to his boss's house.

After stopping at a store, they arrived at a house in an area of Lansing unfamiliar to "B". Once inside the house, "B" was told that it was not the boss's house. Defendant abruptly and crudely stated his intentions. By means of threats, "B" was forced to dance in the nude. Defendant then made her lie on the sofa and had intercourse with her. During this time, defendant threatened to shoot "B" up with heroin so she would not know what she was doing, handcuff her, and referred to a shotgun in the closet. After the second man, who had originally been in the car with defendant, also had intercourse with "B", she was given back her clothes and driven back to East Lansing.

"B" filed a complaint and the defendant was acquitted by a jury on the charge of rape on May 12, 1971.

Witness "C" testified that on February 5, 1971, while a student at Lansing Community College, she was hitchhiking in Lansing and was picked up by defendant. There was another male passenger in the car and "C" sat in the back seat. After some friendly conversation, defendant said he had to run a quick errand but, if "C" would ride along with him to a "chick's" apartment, he would give her a ride the rest of the way to her home. Upon arriving at the house, defendant persuaded "C" to come in and meet the "chick." Once the three had left the car and entered the apartment, it became apparent that there was no "chick" there. Defendant then told "C" that he had brought her there to have intercourse and that only if she stripped naked and danced would she be allowed to leave. He told her "[y]ou've got five minutes to take off your clothes and dance or it's all over."

"C" tried to leave and was struck on the forehead by defendant's fist. "C" tried to kick defendant and there was a struggle. Defendant then threatened "C" with death and said he had killed others. The male passenger was called in to support defendant's statement that he had killed others. Defendant said he liked picking up "good looking white chicks" and having intercourse with them. "C" testified she was afraid she would be killed and so she took off her clothes and danced as defendant had ordered. Soon thereafter defendant pushed "C" down on the sofa and had intercourse with her. Defendant later suggested "C" go to the police and offered to drive her there. He gave "C" his college identification card and asked her to remember his name and address. Defendant then took "C" to within two blocks of her home and dropped her off.

"C" filed a complaint and, on October 28, 1971, the defendant was acquitted on the charge of rape.

The people point out that all four alleged rapes occurred during a five-month period, and all four involved college-age women. All four incidents began with a public meeting and friendly conversation. In each case race was discussed, either in the context of interracial dating or racial prejudice. The conversations with all four women also touched on marijuana.

Witnesses "A", "B" and "C" entered defendant's car immediately, and complainant entered his car soon after their initial meeting. All four women got into defendant's car voluntarily and rode with him for a time expecting to go to a particular place but a deviation was made from the expected route, upon one excuse or another not likely to arouse fear on the part of the women. All four were then driven to an area unfamiliar to them where the intercourse took place.

Complainant and "C" were riding in a car with a seemingly friendly man, engaged in light conversation when, upon finding themselves in an unfamiliar area, the man became threatening and demanding. Witnesses "A" and "B" went with a seemingly friendly man on an "errand" to an unfamiliar apartment, whereupon the man became threatening and demanding. All four were told to submit or they would be harmed with a weapon of some kind though no weapon was produced. All four testified that they submitted to defendant's sudden and crudely spoken demands out of fear that they would be beaten and possibly killed if they didn't. Only "C" attempted to physically fight back in the face of defendant's threats. Aside from the short struggle with "C", the defendant did not beat or rip the clothes of any of the women. Three were given a ride home, and witness "A" was being driven home when she escaped from the defendant's car.

In all of the cases there were apparent opportunities for the women to flee from defendant. The women testified that when these chances occurred, they did not feel the need to flee because defendant was friendly. After the frightening change in defendant's demeanor, the women were not allowed a chance to escape.

Defendant told witness "C" that she should go to the police and furnished her with his name and address and college identification card. Defendant told complainant that going to the police would be futile, since she couldn't prove anything and he had a tape recorder in the car. He then told complainant to be sure and get his license number. Both women went to the police station alleging rape against a man they apparently knew. Knowledge of defendant's name, address, college identifi-

cation and car license numbers, along with other facts such as the lack of bruises and apparent opportunities to escape would tend to lessen the women's credibility when they told their story of rape.

We agree with the trial court and the Court of Appeals that the testimony of "A", "B", and "C" goes beyond tending to show that defendant raped other young women. The many similarities in all four cases tend to show a plan or scheme to orchestrate the events surrounding the rape of complainant so that she could not show nonconsent and the defendant could thereby escape punishment. Defendant's plan made it appear that an ordinary social encounter which culminated in voluntary sex had simply gone sour at the denouement due to his reference to complainant's unpleasant body odor; a vain and bitter woman seeking revenge against an innocent man.

B

We must next determine whether defendant's scheme, plan or system in doing the act was *material* and thus capable of being proved under MCLA 768.27; MSA 28.1050. On its face, the statute allows proof of other acts only when motive, intent, absence of mistake or accident, or the scheme, plan or system in doing the act are *material*. Here, nonconsent is the fact to be proved. The logical relevancy of evidence tending to show a plan or scheme to make it appear as if consent was given is plain. Materiality, however, is a narrower concept than relevancy.

"In the courtroom the terms relevancy and materiality are often used interchangeably, but materiality in its more precise meaning looks to the relation between

the propositions for which the evidence is offered and
the issues in the case. If the evidence is offered to prove
a proposition which is not a matter in issue or proba-
tive of a matter in issue, the evidence is properly said
to be immaterial. As to what is 'in issue', that is, within
the range of the litigated controversy, we look mainly
to the pleadings, read in the light of the rules of
pleading and controlled by the substantive law." Mc-
Cormick on Evidence (2d ed), § 185.

Under this definition evidence probative of a mat-
ter "in issue" is material. Evidence of a plan or
scheme on the part of defendant to orchestrate
events to make proof of nonconsent difficult is, of
course, probative of the contested issue of noncon-
sent.

We note that under the statute it is not required
that the evidence of similar acts directly tend to
prove an essential element of the people's case.
This is evident from the fact that while "motive"
is enumerated in the statute, motive is never an
essential element to be proved in a criminal case.
"Identity" which is always an essential element in
a criminal prosecution is not mentioned in the
statute but clearly may be proved by the use of
similar acts evidence. *People v Kelly,* 386 Mich
330; 192 NW2d 494 (1971). Here the similar acts
were offered to prove a proposition—the plan or
scheme, which was probative of a matter in issue
—nonconsent. The testimony is material within
the meaning of the statute.[4]

Relevant and material evidence may still be

---

[4] The testimony of the four young women also included facts which
tended to show a pattern in the actual sexual contact between
defendant and the women. This evidence was irrelevant and immate-
rial to establishing a scheme, plan or system to orchestrate events so
as to indicate consent. Admission of this testimony was not reversible
error, however, because it was not inflammatory or unduly prejudi-
cial. The testimony merely reflected "one man's rather commonplace
style of engaging in sex". Defendant's brief at p 27.

excluded from a trial if the probative value is substantially outweighed by its unfairly prejudicial effect.[5] In determining admissability the court must balance many factors including: the time necessary for presenting the evidence and the potential for delay; how directly it tends to prove the fact in support of which it is offered; whether it would be a needless presentation of cumulative evidence; how important or trivial the fact sought to be proved is; the potential for confusion of the issues or misleading the jury; and whether the fact sought to be proved can be proved in another way involving fewer harmful collateral effects.

The fact to be established, nonconsent, is crucial in a rape case. Rape is defined by the statute applicable to this case[6] as intercourse with a woman by force and against her will. Proof of penetration, however slight, is sufficient. Often the more serious problem is proving nonconsent. It has sometimes been said that a showing of "resistance to the utmost" by the woman is necessary to convict. *People v Geddes,* 301 Mich 258; 3 NW2d 266 (1942). Absent a physical struggle resulting in bruises or lacerations, such resistance is often difficult to prove. It is now well settled in this state, however, that failure to physically resist to

---

[5] Jones on Evidence (6th ed), § 4:6, p 392. *See also* FR Ev, 403 (effective July 1, 1975), and 2 Wigmore, Evidence (3d ed), § 300 *et seq.,* and 6 Wigmore, Evidence (Chadbourn rev), § 1904.

[6] MCLA 750.520; MSA 28.788 was repealed by 1974 PA 266, § 3, effective November 1, 1974. Section 2 of 1974 PA 266 provides:

"All proceedings pending and all rights and liabilities existing, acquired, or incurred at the time this amendatory act takes effect are saved and may be consummated according to the law in force when they are commenced. This amendatory act shall not be construed to affect any prosecution pending or begun before the effective date of this amendatory act."

The incident on which this action is based occurred on June 1, 1971 and the information was filed September 17, 1971. For the current provisions dealing with criminal sexual conduct, *see* MCLA 750.520a *et seq.;* MSA 28.788(1) *et seq.*

the utmost is excused if the complainant's will was overcome by fear of the defendant. *People v Myers,* 306 Mich 100; 10 NW2d 323 (1943); *Strang v People,* 24 Mich 1 (1871); *People v Palmer,* 47 Mich App 512; 209 NW2d 710 (1973); *People v Dockery,* 20 Mich App 201; 173 NW2d 726 (1969).

In the case at bar the complainant and defendant are in substantial agreement on what happened prior to defendant's alleged change in demeanor and his threats. On the key issue of consent there is directly contradictory testimony; thus the trier of fact must look to the attendant circumstances and the parties' behavior prior and subsequent to the act of intercourse. It then becomes material to know whether defendant orchestrated those circumstances to give the appearance of consent and to make proof of nonconsent difficult. Relations at one moment casual and friendly could, in the next, turn ugly and threatening, and an act of intercourse forced upon an unwilling woman would be no less rape because the behavior of the defendant had for the greater portion of the time spent together been friendly and nonthreatening.

Certainly, the fact that an individual commits a rape at one time has no bearing on whether another woman consented to intercourse at a later time. *Lovely v United States,* 169 F2d 386 (CA 4, 1948). Here, however, the people did not offer the prior acts to prove prior rapes, or that the defendant is a bad man with criminal propensities. The people offered the prior acts to show the scheme, plan or system employed by the defendant in raping the complainant *in a manner and under circumstances* which gave the appearance of consent should he meet with resistance.

It is true that even if a plan to orchestrate

events to make it appear that the woman consented is shown, this is not conclusive proof that the woman did not consent.[7] Evidence of such a plan, however, along with evidence of the other circumstances surrounding the intercourse, is both relevant and material to the issue of consent and therefore properly admissible under MCLA 768.27; MSA 28.1050.

This statute was recently interpreted by this Court in *People v Kelly, supra,* where we held the trial court did not err in admitting evidence of prior and subsequent acts of defendant which tended to show a scheme, plan or system, even where such acts also tended to prove prior crimes by the defendant.

"In the instant case, the defendant allegedly entered the victim's motel room, forced her at gunpoint to put a pillow case over her head, and then raped her twice. The rapist in this case wore no clothes while perpetrating the crime. The defendant then allegedly fled with all of the victim's cash and her tape recorder.

"The testimony of Miss Coleman reveals a strikingly similar crime. Again, the defendant allegedly entered Miss Coleman's motel room, forced her at gunpoint to put a pillow case over her head, and then raped her three times. The rapist wore no clothes during the rape. The defendant then allegedly fled with cash, a watch, and a check. Clearly this subsequent act of the defendant tends to show a scheme, plan or system on his part in performing these acts.

"The defendant was also forced to testify on crossexamination about his altercation in a motel room with a lady and her boyfriend. While there was no rape involved in that incident, the facts are sufficient to tend to show a common scheme, plan or system on the part

---

[7] "[H]e in a few minutes ravished this fair creature, or at least would have ravished her, if she had not, by a timely compliance, prevented him." Fielding, *Jonathan Wild,* Book III, Ch 7, quoted in *McDonald v Wainwright,* 493 F2d 204, 206 (CA 5, 1974).

of the defendant within the latitude of cross-examination." 386 Mich at 334–335.

*Kelly* involved robbery (a specific intent crime) as well as rape, and the evidence of other similar acts tended to show a scheme, plan or system material to the issues of intent and identity. In the case at bar, prior similar acts show a scheme, plan or system material to the issue of consent. The acts offered here are at least equally "strikingly similar" as those in *Kelly.* Other jurisdictions have reached results similar to our application of MCLA 768.27; MSA 28.1050 in *Kelly* and in this case, either under a similar statute or the common law.[8]

The trial judge in this case recognized that the statute is cast in permissive language and undertook to balance probative value against possible prejudice to the defendant. There was extensive argument on this point by the parties out of hearing of the jury. After study, the judge determined that the jury ought to be able to hear the testimony of the three witnesses, properly limited by the exclusion of certain matters which the judge concluded were too inflammatory and of too little probative value. Prior to each witness's testimony and in his jury charge, the judge instructed the jury as to the limited purpose for which the evidence was being offered and for which they were to consider it.[9]

---

[8] *State v Downing,* 109 Ariz 456; 511 P2d 638 (1973). *State v Finley,* 85 Ariz 327; 338 P2d 790 (1959), which noted the fact that in each alleged rape the defendant went through a personality change from a "normal" to a "frightening" demeanor. *Dean v State,* 277 So 2d 13 (Fla, 1973). *Williams v State,* 110 So 2d 654 (Fla, 1959). *State v Gonzales,* 217 Kan 159; 535 P2d 988 (1975). *State v Hampton,* 215 Kan 907; 529 P2d 127 (1974). *See also* cases complied in 77 ALR2d 841.

[9] Before the jury heard the testimony of witnesses "A", "B", and "C", the court instructed the jury as follows:

"The prosecution is going to call some additional witnesses.

"You and you alone as the trier of facts will evaluate the testimony

Concluding, as we do, that the testimony was "material" in compliance with the statute, we decline at this stage to upset the trial court's judgment as to the balance of probative value and prejudicial effect.[10] The facts summarized above

you are about to hear. However, it is the court's understanding that the testimony of these witnesses may involve other acts on the part of the defendant.

"Evidence of alleged prior similar acts by the defendant may be relevant and material in showing the defendant's motive or intent or his alleged scheme, plan or system in doing the alleged act in question. However, this evidence of other alleged offenses or acts on the part of the defendant is not admissible at this trial to show that the defendant is more likely to have committed the act charged in this case, or to show that the defendant is guilty of other crimes of rape, or to show the criminal character of the accused, but rather this testimony will be admitted solely as that evidence might bear upon the issue of the defendant's motive, or intent, or his alleged scheme, plan or system in doing the alleged act in question here, that is, the alleged rape of [complainant] on June 1, 1971.

"You and you alone are the sole judges of the credibility of this testimony by these witnesses, and you may in turn consider this testimony when you evaluate the testimony of [complainant] and Mr. Oliphant with regard to which testimony you will believe and how much weight and credit you will give it.

"However, again the fact that the defendant had relations with any of these other young ladies does not necessarily make the defendant guilty of rape in this matter, but rather it is testimony that you may properly consider in determining the credibility of the witnesses."

The portion of the jury charge dealing with the similar acts testimony was substantially the same as the above quoted cautionary instruction with the addition of the following two paragraphs:

"I would also advise you that just because you find that there were some common similarities between incidents related here does not in and of itself mean that the defendant raped [complainant]. Normal, every day, common acts should not in and of themselves be considered part of any common scheme or plan.

"In order to consider the testimony of ["A"], of ["B"], and of ["C"], you must find that there was in fact a common scheme, plan or system in order that that system be material in this case and in order for that system to bear upon the issues in this case as I have and will define them."

10 "The separate and distinct acts to be admissible must have a reasonably close relation in scheme and pattern and in time to the act charged in order to be admissible under the common plan or scheme exception. The determination, however, of whether independent criminal acts are so closely connected with the crime charged as to be admissible is in the first instance a matter resting largely within the discretion of the trial court, and this court will not reverse

exhibit such similarities as to be probative of a plan or scheme. The dearth of evidence on consent, aside from the contradictory testimony of complainant and defendant, make evidence as to the circumstances of the incident particularly important in this case. We are not unmindful of the danger of this type of evidence prejudicing the jury against the defendant. On these facts, however, there is no basis to conclude that the trial judge, who addressed the issue with great care, abused his discretion in concluding that the probative value was not substantially outweighed by the potentially unfair prejudicial effect.

The fact that the instant jury returned a verdict of guilty, while a prior jury which had not been presented the evidence of plan or scheme was unable to reach a verdict, does not prove that the evidence was unduly prejudicial, but suggests no more than that the instant jury may have found it probative.

II

The second issue presented by defendant stems from the fact that the defendant had already been acquitted of the rapes testified to by witnesses "B" and "C". Defendant contends that allowing testimony on these two alleged rapes constituted reversible error as a violation of the doctrine of collateral estoppel as embodied in defendant's Fifth Amendment right against double jeopardy.

The keystone of defendant's argument is *Ashe v Swenson,* 397 US 436; 25 L Ed 2d 469; 90 S Ct 1189 (1970). *Ashe* involved a conviction for the

unless there is a clear abuse of discretion. Whether evidence which is otherwise admissible should be excluded for remoteness also rests largely in the discretion of the trial court." *State v DePauw,* 246 Minn 91, 95–96; 74 NW2d 297, 300 (1955).

robbery of a participant in a card game after the defendant had previously been acquitted of robbing another of the players in the same game. The Supreme Court held that the first jury had determined that the state had failed to prove defendant had been one of the robbers in the first trial and was, therefore, precluded from trying to prove the same fact in the second trial which was identical in all aspects except for the named victim. *Ashe* involved a single criminal episode and the relitigation of the same fact after it had been decided in defendant's favor in the first trial.

In the case at bar, the jury had to decide whether defendant raped complainant on June 1, 1971. The two other incidents testified to which resulted in acquittals were not part of the same criminal episode,[11] nor did they turn on the same crucial fact. An issue of fact in each of the prior trials was whether "B" and "C" consented to the intercourse or submitted as the result of the threat of force. These issues are distinct from the question of whether complainant consented to intercourse or submitted as the result of the threat of force. Assuming the only rational basis for the prior acquittals was a consent determination favorable to defendant,[12] this could in no way bar the

[11] "B" was allegedly raped on February 1, 1971 and "C" was allegedly raped on February 5, 1971, while complainant was raped on June 1, 1971.

[12] In the prior trials for the rape of "B" and "C", defendant admitted he had intercourse but contended that it was consensual. In the case at bar, the people signed the following stipulation:
STIPULATION IN SUPPLEMENT OF THE RECORD

It is hereby agreed and stipulated by the parties that the record in this case be supplemented with the following information:

That in Ingham County Circuit Court case Number 22543, Charles Oliphant, defendant therein, was acquitted by a jury of the charge of rape MCLA 750.520; [MSA 28.788] on May 12, 1971; the complainant being [B].

That in Ingham County Circuit Court case Number 22741, Charles Oliphant, the defendant therein, was acquitted by a jury of the rape

people from proving nonconsent on the part of complainant.

Defendant would have us extend *Ashe* to bar the use of probative evidence simply because it had been offered once before in a trial dealing with an entirely separate event which resulted in acquittal. Defendant cites *Wingate v Wainwright,* 464 F2d 209 (CA 5, 1972), and *Blackburn v Cross,* 510 F2d 1014 (CA 5, 1975), in support of his position. But those decisions of a foreign Federal Circuit Court of Appeals involved an expansion of the *Ashe* holding[13]—an expansion this Court is not bound to adopt. The *Wingate* court stated:

---

MCLA 750.520; [MSA 28.788] on October 28, 1971; the complainant being [C].

In each of the above cases Charles Oliphant judicially admitted that sexual intercourse took place between he *[sic]* and the complainant; but asserted that such act occurred voluntarily with the complainant's consent.

In each of the above cases the complainant claimed that the sexual intercourse with Charles Oliphant occurred as the result of the threat of force.

That in each of the above cases the complainants stated that they were over the age of 16 and Charles Oliphant did not contest such claim.

An issue of fact in each case for the jury to resolve was whether or not the sexual intercourse was voluntary or the result of the threat of force.

The foregoing stipulation is approved as to form and content.

[13] "In *Wingate v Wainwright,* 464 F2d 209 (CA5, 1972) *this Circuit significantly expanded the Ashe holding.* In *Wingate* a federal habeas corpus petitioner attacked his conviction for the robbery of a small store. At his trial, the state introduced evidence tending to show that Wingate had committed four additional robberies; he had been tried for and acquitted of two of these robberies. In his closing remarks there was heavy reliance by the prosecutor on the evidence of additional robberies.

"This court held that *Ashe* does not merely bar a subsequent state prosecution, the maintenance of which depends upon a successful relitigation of a fact issue which had previously been settled adversely to the state by an earlier acquittal. Rather, the double jeopardy clause, which includes the doctrine of collateral estoppel under *Ashe,* prohibits the state from relitigating, for any purpose, an issue which was determined in a prior prosecution of the same party. Hence, there is no difference between relitigating an ultimate fact or an evidentiary fact; relitigation of either is prohibited." *Blackburn v Cross,* 510 F2d at 1017 (emphasis added).

"Although both Mr. Justice Brennan in his concurrence and Chief Justice Burger in his dissent discuss the 'same transaction' test as a standard for double jeopardy we do not believe that the holding in *Ashe* rests on that foundation. Instead the Court speaks in terms of prohibiting a *relitigation* in any future lawsuit between the same parties of issues actually determined at a previous trial." 464 F2d at 213. (Emphasis in original.)

Although the majority opinion in *Ashe* does not discuss the meaning of the expression "same transaction", nevertheless the facts of *Ashe* presented a "same transaction" issue. We read *Ashe* in the context of the facts on which it was based as holding that an issue of ultimate fact litigated in favor of defendant in one trial cannot be relitigated by the government in a subsequent trial for an offense arising out of the same transaction.[14]

Collateral estoppel as embodied in the Fifth Amendment does not preclude the receipt of testimony material to establishing a crime simply because it was offered and received in a prior trial on a totally distinct matter where defendant was acquitted. As the court below noted, *Ashe* does not vitiate the above principle as expressed as the law of this state in *People v Johnston,* 328 Mich 213; 43 NW2d 334 (1950).[15] *People v Oliphant,* 52 Mich App 242; 217 NW2d 141 (1974).

[14] This Court has held that the concept of double jeopardy does include the "same transaction" test. *People v White,* 390 Mich 245; 212 NW2d 222 (1973). However, this does not require the adoption of the *Wingate-Blackburn* interpretation of *Ashe.* Offering evidence of a prior crime, for which defendant has been acquitted, to a jury embarked on a distinct inquiry, as here, does not involve asking the second jury to convict defendant for the prior crime. It does not involve the second jury contradicting the first jury, since the first jury did not find that defendant did not commit the crime, only that the people had not proved that he had beyond a reasonable doubt.

[15] "The general rule on the subject is stated in 22 CJS, p 1118, in the following language:

" 'Similarly, evidence tending to show the commission of other

The evidence here was not offered in an effort to convict defendant of the rape of witness "B" or "C", but rather to show the scheme, plan or system employed by the defendant. As noted above,[16] proof of such a scheme, plan or system does not conclusively negative consent. The integrity of defendant's acquittals in these cases is not threatened. Reference will be had to the words of the Constitution, "nor shall any person be subject *for the same offense* to be twice put in jeopardy of life or limb"[17] (emphasis added). *Ashe* held that collateral estoppel was incorporated in the Fifth Amendment's guarantee against double jeopardy. Double jeopardy arises when there is relitigation of the same facts from the same transaction. There is no double jeopardy in the instant case.

In the case at bar the people were not using the prior cases as dry runs to sharpen their case. The

offenses is admissible if it tends to show motive, system, method, or course of conduct, a plan or scheme to commit a series of crimes including the one on trial, or the intimate and apparently confidential relations between the informer and accused. On the other hand, evidence of other offenses which does not tend to prove the bribery charge should be excluded.

" 'The fact that accused was tried and acquitted of the other offense does not bar the introduction of evidence thereof in a prosecution for bribery where such evidence shows the general plan or system of the bribe, or illustrates accused's acts in the transaction on trial, or throws light on the later evidence.'

"In the instant case it is suggested that the doctrine of *res judicata* should be applied to preclude the introduction of testimony offered and received in the prosecution for conspiracy. The language of the second paragraph of the above quotation from CJS is directly in point on this issue. Defendant is not on trial for the offense charged against him in the prior case. The question presently at issue is whether, as charged by the prosecution, he accepted a bribe in violation of the statute on which the information is based. Testimony tending legitimately to establish such offense, or some element thereof, may not be excluded solely on the ground that it was offered and received in the prior case as bearing on defendant's guilt of the offense there charged." *People v Johnston,* 328 Mich at 226–227.

[16] *See* text accompanying fn 7, *supra.*

[17] US Const, Am V.

testimony was not intended to prejudice the defendant in the eyes of the jury, and there were specific instructions on the purposes for which the testimony was offered and its permissible uses. We hold that the testimony of the two witnesses was not inadmissible under the doctrine of collateral estoppel as embodied in the Fifth Amendment double jeopardy provisions.

## III

Defendant's third argument is that the trial court's failure to conduct a formal competency hearing as required by MCLA 767.27a; MSA 28.966(11) was reversible error and that the *nunc pro tunc* competency hearing ordered by the Court of Appeals[18] is not permissible under the statute and is a denial of defendant's constitutional rights.

The case at bar is controlled by our decision in *People v Lucas,* 393 Mich 522; 227 NW2d 763 (1975), which involved similar facts. Here defendant was remanded for an evidentiary hearing at the trial court level. After the submission of evidence, the court found defendant had been competent to stand trial at the time of trial. Following *Lucas,* we find no reversible error on this point.

## IV

Defendant next contends that the trial court's

---

[18] The Court of Appeals on April 12, 1973 entered an order in part as follows:

"It is further ordered that the motion to remand be, and the same is hereby, granted. The cause is remanded to the Circuit Court for the County of Ingham for the sole purpose of making a record of all facts and circumstances surrounding the commitment of Charles E. Oliphant to the Forensic Center for Psychiatric Evaluation and the subsequent proceedings taken by the court thereon. It is suggested that the hearing for that purpose be held expeditiously and that the issue raised by the motion for peremptory reversal be treated as an issue on appeal to be briefed by both parties and considered by the court when the case is submitted."

denial of his challenge of the jury array deprived him of his right to an impartial jury drawn from a fair cross section of the community. This claim is based on the fact that no persons between the ages of 18 and 21 appeared on the array. Defendant contends that since the Age of Majority Act, MCLA 722.52; MSA 25.244(52), was effective prior to his trial, and that many 18- to 21-year-olds had registered to vote and were, therefore, eligible for jury service under MCLA 600.1306; MSA 27A.1306, the fact that no 18- to 21-year-olds were available to be picked for the jury which tried his case was constitutionally improper.

We note that defendant first raised this challenge on the first day of his second trial when the basis for the objection had been apparent for some time. Thus, the objection, exhaustively discussed and denied on the merits by the trial court, ought to have been rejected as not timely under MCLA 600.1354; MSA 27A.1354. We decline to disturb the jury verdict on this point. MCLA 600.1354; MSA 27A.1354.

V

Defendant's final contention is that, because he was retried after one jury had failed to agree upon a verdict, he was twice placed in jeopardy in violation of his constitutional rights. This objection was not raised in the trial court, the Court of Appeals, or in the application for leave to appeal. While this Court does have the power to review error which has not been properly preserved, such power is only to be exercised in compelling circumstances to avert a miscarriage of justice. *People v Farmer,* 380 Mich 198; 156 NW2d 504 (1968). There is nothing to justify the exercise of this

power where the record in this case reveals facts clearly within the authority of *United States v Perez,* 22 US (9 Wheat) 579; 6 L Ed 165 (1824), and *People v Duncan,* 373 Mich 650; 130 NW2d 385 (1964). Accordingly we decline to consider this issue as not properly presented.

Affirmed.

WILLIAMS, COLEMAN, FITZGERALD, and LINDEMER, JJ., concurred with RYAN, J.

KAVANAGH, C. J. *(for reversal).* Admitting the testimony of the other asserted "victims" of defendant was reversible error.

The only matter in issue in this case was whether or not the prosecutrix consented to the admitted sexual intercourse with the defendant.

The majority opinion finds that evidence of defendant's past sexual conduct is "material to know whether defendant orchestrated those circumstances to give the appearance of consent and to make proof of nonconsent difficult".

This misses the point.

The issue is not whether the *appearance* of consent was created, but whether *in fact* consent was given. Evidence of the defendant's prior alleged rapes of other women at other times could never be material to the issue of this complainant's consent.

*People v Kelly,* 386 Mich 330; 192 NW2d 494 (1971), relied upon heavily by the majority, will not support the theory for which it is cited. The effect of *Kelly,* where the issue was identity, was to hold that scheme, plan or modus operandi could be material to proof of that issue. Scheme, plan, motive, modus operandi, etc. of defendant's alleged

prior rapes can never be material to the question of whether or not consent was given.

In a similar circumstance, the Supreme Court of Rhode Island in *State v Beaulieu*, — RI —; 359 A2d 689, 692 (1976), appropriately held that

"under the present circumstances, the suspect testimony should have been omitted from the record. We have already stated that, pertaining to the charge of rape, the solitary issue herein is whether prosecutrix consented. The defendant admits to having performed the act as described and, thus, questions of guilty knowledge or intent are rendered irrelevant. As the premise was framed by another court, '[t]he fact that one woman was raped * * * has no tendency to prove that another woman did not consent.' *Lovely v United States,* 169 F2d 386, 390 (CA 4, 1948)."

Three women testified at this trial that defendant had raped them in the past.

In the case of one of these witnesses, no charges were ever filed. In the other two cases, the defendant was tried *and acquitted of rape.*

It is anomalous that these witnesses should be permitted to testify that defendant did rape them, when a jury had determined that he did not.

As the United States Court of Appeals recently observed in *Wingate v Wainwright,* 464 F2d 209, 215 (CA 5, 1972):

"It is fundamentally unfair and totally incongruous with our basic concepts of justice to permit the sovereign to offer proof that a defendant committed a specific crime which a jury of that sovereign has concluded he did not commit. Otherwise a person could never remove himself from the blight and suspicious aura which surround an accusation that he is guilty of a specific crime".

The trial judge instructed the jury that "You and you alone are the sole judges of the credibility of this testimony by these witnesses * * * ".

That is not the case. The juries that acquitted defendant of rape in the previous cases were "the sole judges of the credibility of * * * these witnesses".

"[T]he double jeopardy clause, which includes the doctrine of collateral estoppel under *Ashe*,[1] prohibits the state from relitigating, for any purpose, an issue which was determined in a prior prosecution of the same party. Hence, there is no difference between relitigating an ultimate fact or an evidentiary fact; relitigation of either is prohibited." *Blackburn v Cross*, 510 F2d 1014, 1017 (CA 5, 1975).[2] Defendant was denied a fair trial. I would reverse.

LEVIN, J., concurred with KAVANAGH, C. J.

LEVIN, J. *(dissenting)*. Charles Oliphant was convicted of rape[1] and gross indecency.[2]

Oliphant's and the complainant's accounts of the circumstances of their meeting and other events preceding the sexual acts generally agreed. The factual issue was whether she consented to the sexual acts.

Postulating that it would assist the jury in deciding the issue of consent, the judge permitted three other women to testify, over objection, that, within a few months of the incident charged, Oliphant had raped them. They too had voluntarily entered into a brief relationship with him and accepted an automobile ride during which, they

---

[1] *Ashe v Swenson*, 397 US 436; 90 S Ct 1189; 25 L Ed 2d 469 (1970).

[2] *See also, People v Gray*, 393 Mich 1, 3; 222 NW2d 515 (1974).

[1] MCLA 750.520; MSA 28.788.

[2] MCLA 750.338b; MSA 28.570(2).

asserted, he detoured to a place where they were forced to participate in sexual acts.

All agree that although evidence that the defendant has committed other crimes may tend to support an inference that he is predisposed to commit crime or a particular crime and, therefore, is relevant because it may tend to support the further inference that he committed the charged offense, it is long-established judicial policy that evidence tending to show that the defendant committed an offense not charged in the information is not admissible for the purpose of showing his criminal disposition or a character trait or propensity to commit that offense to support an inference that he committed the charged offense.[3]

Litigation concerns the scope of exceptions allowing admission of evidence tending to establish an element of the charged offense or to negative a defense, subject to the power of the court to bar such evidence where the probative value is outweighed by the likelihood that it will unduly prejudice the jury against the defendant, preventing an objective determination of the disputed factual issues.

Seeing, with the trial judge and the Court of Appeals, a similarity in the women's descriptions of the events surrounding the sexual acts, this Court holds the evidence admissible on the ground that "[e]vidence of a plan or scheme on the part of defendant to orchestrate events to make proof of nonconsent difficult is, of course, probative of the contested issue of nonconsent," and declares that it will not substitute its judgment for that of the trial judge in the balancing of probative value and prejudicial effect.

---

[3] *See* McCormick, Evidence (2d ed), § 190, p 447. *See also* FR Ev 403, 404.

The Court's holding incorporates a number of conclusions: that the pattern evidences a plan or scheme; that the purpose of the plan or scheme perceived is to make proof of non-consent difficult; that, implicitly, the pattern, plan or scheme makes proof of non-consent difficult; and that it is probative on whether the complainant consented. The opinion of the Court does not consider alternative analyses or state reasons for all its conclusions.

I share the apprehension, reflected in the judgment of the trial judge and the opinions of the Court of Appeals and this Court, that Oliphant sexually exploits women. I am unable to join in the Court's opinion because it fails to state a principled basis for an exception to the general rule against the admission of other crimes evidence.

The evidence that Oliphant is a rapist is inadmissible to prove a character trait or propensity to commit the charged offense to support an inference that he may have raped the complainant. Such evidence, while probative of a propensity to use force to have sexual intercourse if advances are resisted, is indistinguishable from what may not be proven, propensity to rape.

A man's propensity to use force is not probative of non-consent; it shows rather how he may react or what may occur if the woman does not consent.

Unless a woman is abducted, the social relationship between the man and woman will appear consensual. Because sexual relations are generally solicited and occur in private, whenever the issue in a sexual offense case is consent the prosecution will be largely dependent on the testimony of the complainant, due to the nature of the offense and not to "orchestration".

The evidence that Oliphant pursued women in a conventional pattern of consensual social relationships does not tend to establish that he acted in accordance with a plan. Even if a plan is perceived, there is no objective basis for concluding that Oliphant's purpose in adopting the plan was to hinder effective prosecution by making non-consent difficult to prove rather than to facilitate meeting women and transporting them to a place where they could be solicited for sexual purposes.

Assuming, *arguendo,* that pattern evidence was admissible for this purpose, the prosecutor had the burden of establishing that defendant's conduct was pursuant to a plan, not custom or habit, and that the purpose of any such plan was jury persuasion, not woman persuasion. Unless there is an objective basis, apart from the allegations of rape, for concluding that the defendant had a plan and that its purpose, or primary purpose, was jury persuasion, there is no reason for distinguishing this case from other cases where allegations of other rapes have been made against a defendant. Surely, allegations of other rapes may not be proven simply because the social relationship was consensual and the act of intercourse occurred in private; but that, I fear, is the tendency of the Court's opinion.

Even if the consensual format of the relationship was "orchestrated", it could not give rise to an inference or appearance of consent. It would not be reasonable to infer from a woman's participation with a man in a social relationship and agreement to accompany him in an automobile that she consented to have sexual intercourse with him. Since no inference adverse to the complainant results from the consensual format of her relationship with Oliphant, there is no basis for

allowing evidence to rebut such an inference even
if the format were orchestrated.

It is understandable that the prosecutor would
have a sense of frustration following the earlier
trials which resulted in Oliphant's acquittal of
raping witnesses B and C and a mistrial in the
instant case when the jury failed to agree on a
verdict.

It is the Court's duty, however, to preserve the
adjudicative process and safeguards designed to
assure all persons a fair trial against being over-
run by a juggernaut of felt concern to facilitate a
result perceived to be just in a particular case.

The Court should not uncritically yield to the
assumptions implicit in the contention that the
consensual format of Oliphant's social relation-
ships with women unduly hindered prosecution.

Jurors know that some men take sexual advan-
tage of women and that merely because a social
relationship is consensual and sexual acts are in
private does not mean that the woman consented.
Although the first jury that heard the evidence in
this case could not agree on a verdict, the com-
plainant and the prosecutor succeeded—despite
the so-called orchestration and consensual aspects
of the initial relationship—in convincing some
jurors that the complainant did not consent.[4]

When the issue in a rape case is consent, deci-
sion will turn on the jurors' evaluations of credibil-
ity which will depend not only on their appraisal
of the plausibility and coherence of the competing
testimony and the circumstantial evidence, but on

---

[4] There were circumstances tending to inculpate Oliphant. The
missing door handle on the passenger side, and the improbability that
the complainant, according to medical testimony a virgin, would
agree to have intercourse with Oliphant, whom she had met only a
few hours earlier, although she had not had intercourse with her
boyfriend with whom she had engaged in oral sexual acts.

an intrinsically subjective evaluation: What kind of a man is the defendant; what kind of woman is the complainant?

The prosecutor's difficulty in obtaining a conviction may have been attributable to the composition of the juries, their biases and way of thinking about life and people. Juries tend to be composed of older persons with middle-class values, persons likely to regard with dismay a woman who meets a man under the circumstances described by the complainant and on short acquaintance accompanies him on an automobile ride. Additional factors may have been juror notions regarding the mores of college students and white women who date black men. Middle-class values explain, as plausibly as orchestration, the frustration of the earlier efforts to convict Oliphant.

If I am correct in venturing that the difficulty in successfully prosecuting Oliphant was not orchestration but may have been middle-class values, the prosecutor's objectives might be achieved by granting Oliphant the relief he seeks, a retrial by a jury composed of a more representative group of citizens, including peers of Oliphant and the complainant, black and white young men and women.[5]

A jury without a generation gap might be less inclined to view with disfavor a woman who, in the circumstances described, on short acquaintance accompanies a man on an automobile journey. Public safety does not require further dismantling of the sound and long-established rule against use of propensity evidence, recently extended by the Legislature to complainants in rape prosecutions.[6] Nor is there need further to under-

---

[5] Oliphant assigned as error the failure to include in the jury panel persons between the ages of 18 and 21.

[6] MCLA 750.520a *et seq.;* MSA 28.788(1) *et seq.*

mine, by indirection, the rule against duplicitous informations.[7]

The Court has attempted to articulate a principled distinction justifying the admission of testimony alleging other rapes. It has succeeded only in creating an exception unprecedented in this state which, hopefully, will be confined to circumstances here present where a combination of factors—casual acquaintance, racial difference between the defendant and the complainant, and cultural difference between the complainant and the persons comprising the jury—may have put the complainant in a bad light with jurors.

I am concerned that the exception will not be so limited.[8] The history of exceptions to the general rule barring admission of other crimes evidence is not reassuring; once stated in a particular case an exception tends to be applied mechanically and to take on a life of its own.[9]

Further, the Court permits re-litigation of factual issues already resolved against the people in earlier prosecutions in violation of the Double Jeopardy Clause.

---

[7] 1 Gillespie, Michigan Criminal Law and Procedure (2d ed), § 372, p 447. *See* fn 16, *infra.*

[8] It may be argued that my concern is obviated by the change in the statute.

The new criminal sexual conduct act does not speak in terms of the victim's consent or will but of whether "force or coercion is used to accomplish the sexual penetration" or "contact". MCLA 750.520a, *et seq.;* MSA 28.788(1) *et seq.* The act provides that the "victim need not resist the actor". MCLA 750.520i; MSA 28.788(9).

The primary issue is whether force or coercion is used; non-consent may, it would appear, be an inference from evidence of force or coercion. Consent would, of course, be a defense. *See generally* Robinson, *Civil and Criminal Evidence,* 21 Wayne L Rev 437, 484 (1975).

[9] Note, *Procedural Protections of the Criminal Defendant—A Re-Evaluation of the Privilege Against Self-Incrimination and the Rule Excluding Evidence of Propensity to Commit Crime,* 78 Harv L Rev 426, 439 (1964); Note, *Other Crimes Evidence at Trial: Of Balancing and Other Matters,* 70 Yale L J 763, 768 (1961).

I

In the earlier trials, where consent was the only issue, Oliphant was acquitted of raping witnesses B and C.[10] The doctrine of collateral estoppel bars re-litigation of whether B and C consented to engage in sexual acts with him. " 'Collateral estoppel' * * * stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties *in any future lawsuit." Ashe v Swenson,* 397 US 436, 443; 90 S Ct 1189; 25 L Ed 2d 469 (1970) (emphasis supplied).[11]

The Court acknowledges this rule of law, but would limit it to re-litigation of a factual issue in a subsequent trial for an offense arising out of the same transaction.[12]

The United States Court of Appeals for the Fifth Circuit has rejected the "same transaction" limitation: "Although both Mr. Justice Brennan in his concurrence and Chief Justice Burger in his dissent discuss the 'same transaction' test as a standard for double jeopardy we do not believe that the holding in *Ashe* rests on that foundation. Instead the Court speaks in terms of prohibiting a *relitigation* in any future lawsuit between the

---

[10] Witness A did not file a complaint with the police.

[11] In *Ashe v Swenson,* 397 US 436; 90 S Ct 1189; 25 L Ed 2d 469 (1970), six men, engaged in a poker game, were robbed by masked gunmen. Defendant was acquitted of robbing one of the players. In a Federal habeas corpus proceeding, the United States Supreme Court held that defendant's acquittal in the first trial at which the issue was identity precluded the state's attempt to prove his identity in a second trial alleging that he robbed another player.

[12] All offenses arising out of the same transaction must be tried together. *People v White,* 390 Mich 245; 212 NW2d 222 (1973). The Court's construction of the doctrine of collateral estoppel virtually eliminates the doctrine in criminal prosecutions in this state.

same parties of issues actually determined at a previous trial." *Wingate v Wainwright,* 464 F2d 209, 213 (CA 5, 1972) (emphasis in original).[13]

The rule prohibiting re-litigation of the same factual issue, incorporated into the Double Jeopardy Clause, protects the accused from having to "run the gantlet"[14] more than once. The Double Jeopardy Clause is a guarantee "that the State with all its resources and power [shall] not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity * * * ". *Green v United States,* 355 US 184, 187; 78 S Ct 221; 2 L Ed 2d 199 (1957).

It is idle to suggest that Oliphant was not required to run the gantlet a second time regarding the circumstances of his sexual relations with witnesses B and C. "It is fundamentally unfair and totally incongruous with our basic concepts of justice to permit the sovereign to offer proof that a defendant committed a specific crime which a jury of that sovereign has concluded he did not commit. Otherwise a person could never remove himself from the blight and suspicious aura which surrounds an accusation that he is guilty of a specific crime." *Wingate v Wainwright, supra,* p 215.

---

[13] The Court held

"that under *Ashe* where the state in an otherwise proper prosecution seeks for any purpose to relitigate an issue which was determined in a prior prosecution of the same parties, then the evidence offered for such a relitigation must be excluded from trial and the state must be precluded from asserting that the issue should be determined in any way inconsistent with the prior determination." *Wingate v Wainwright,* 464 F2d 209, 215 (CA 5, 1972).

Similarly, *see Blackburn v Cross,* 510 F2d 1014 (CA 5, 1975).

[14] *Green v United States,* 355 US 184, 190; 78 S Ct 221; 2 L Ed 2d 199 (1957).

Although the Court concedes that "[a]n issue of fact in each of the prior trials was whether 'B' and 'C' consented to the intercourse or submitted as the result of the threat of force", it states that "[t]hese issues are distinct from the question of whether complainant consented to intercourse or submitted as the result of the threat of force". Indeed, and that is why A, B and C's testimony is not material; see part II *infra.* Moreover, their testimony is of no probative value to the prosecution unless the jurors conclude that Oliphant raped them. The prosecutor necessarily asked the jury to so conclude.

The cases of B and C were actions between the same parties now before the Court (the people and Oliphant). It was adjudicated that the people had not proved that Oliphant's sexual relationships with B and C were non-consensual.[15]

Yet the prosecutor was permitted to ask this jury to reach the opposite conclusion. Oliphant was accordingly required to defend against allegations that factual issues resolved in the cases of B and C had been erroneously decided. This was violative of the Double Jeopardy Clause.[16]

---

[15] The Court states that "[o]ffering evidence of a prior crime, for which defendant has been acquitted, to a jury embarked on a distinct inquiry, as here, does not involve asking the second jury to convict defendant for the prior crime. It does not involve the second jury contradicting the first jury, since the first jury did not find that the defendant did not commit the crime, only that the people had not proved that he had beyond a reasonable doubt". The Supreme Court rejected this theory in *Ashe, supra,* p 443, where it stated "As a rule of federal law, therefore, '[i]t is much too late to suggest that this principle [of collateral estoppel] is not fully applicable to a former judgment in a criminal case, either because of lack of "mutuality" or because the judgment may reflect only a belief that the Government had not met the higher burden of proof exacted in such cases for the Government's evidence as a whole although not necessarily as to every link in the chain' *United States v Kramer,* 289 F2d 909, 913 [CA 2, 1961]."

[16] What was done here is at a level of impropriety even greater than if Oliphant had been theretofore convicted of raping B and C

II

The Court declares that the other women's testimony that Oliphant raped them under similar circumstances is probative of whether the complainant in the instant case consented to participate in sexual acts with him, an issue distinguishable from Oliphant's propensity to engage in sexual activity irrespective of consent.

The statutory issue is whether the sexual intercourse was "by force and against her will".[17]

While evidence that Oliphant has raped other women is probative of a propensity to use force, if deemed necessary, to have sexual intercourse, that propensity is indistinguishable from what may not be proven, propensity to rape.

A man's propensity to use force suggests how he might react to a woman's refusal to consent. It does not tend to show whether the woman's consent obviated such a reaction or the "will" of the woman.

The "victim's" propensity to engage in sexual intercourse may not, under the new criminal sex-

and evidence of those convictions had been offered on the theories advanced in this case.

The other crimes evidence here showed not only wrongdoing, but in effect put Oliphant on trial for such wrongdoing: the uncharged allegation of rape and the two charged rapes of which he was acquitted. On that ground alone the evidence should have been excluded.

The law prohibits the filing of a duplicitous information because it recognizes the difficulty of defending against multiple charges.

Oliphant could not have been charged with all four rapes in one information. See fn 7, supra. He should not have been prosecuted for more than one offense at a time by indirection. Although nominally one rape was proved by evidence of four rapes, the people asserted that it was necessary to prove four rapes to obtain a conviction; it is stultifying to maintain that in convicting Oliphant of raping the complainant the jury may not also have decided that he raped one or more of the other women who testified against him.

[17] MCLA 750.520; MSA 28.788.

ual conduct statute,[18] be shown. This reinforces the public policy against the use of propensity evidence. Fairness to persons accused of sexual offenses requires that there be no dilution of the traditional safeguard against the use of propensity evidence against defendants.

While Oliphant's propensity to use force indicates that if the complainant resisted, he may have sought to have sexual intercourse by force or threat of force, it does not indicate whether the complainant resisted or consented uninfluenced by force.

In sum, a man's propensity to use force when he encounters resistance does not tend to show whether a woman resisted, submitted under duress or consented freely. Such a propensity does not tend to show that the woman did not consent but rather what may have occurred if she did not. The evidence of other rapes tends to show that Oliphant is a rapist and may be guilty of the offense charged, that if he thought it necessary he would have used force or a show of force to have inter-

---

[18] "(1) Evidence of specific instances of the victim's sexual conduct, opinion evidence of the victim's sexual conduct, and reputation evidence of the victim's sexual conduct shall not be admitted under sections 520b to 520g unless and only to the extent that the judge finds that the following proposed evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value:

"(a) Evidence of the victim's past sexual conduct with the actor.

"(b) Evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, or disease.

"(2) If the defendant proposes to offer evidence described in subsection (1)(a) or (b), the defendant within 10 days after the arraignment on the information shall file a written motion and offer of proof. The court may order an in camera hearing to determine whether the proposed evidence is admissible under subsection (1). If new information is discovered during the course of the trial that may make the evidence described in subsection (1)(a) or (b) admissible, the judge may order an in camera hearing to determine whether the proposed evidence is admissible under subsection (1)." MCLA 750.520j; MSA 28.788(10).

course with the complainant. Although the evidence is probative of propensity to use force (propensity to rape) it is not admissible for that purpose. Such evidence does not negate complainant's consent or tend to show non-consent, the issue it is said to be probative of and admissible to prove.

## III

The Court says that the pattern evidence is admissible to show that Oliphant "orchestrate[d] events to make proof of nonconsent difficult".

The prosecutor had no difficulty in making a *prima facie* showing of non-consent. He did so, as is generally done, through the testimony of the complainant. His difficulty at the first trial in the instant case, which ended without a verdict when the jury could not agree, was in persuading the jury to believe the complainant's testimony and to disbelieve Oliphant's.

The prosecutor's problem of jury persuasion in this case does not differ from that in other sexual offense cases, where the social relationship was consensual, the circumstantial or objective evidence is inconclusive or nonexistent, and the verdict depends on the jury's perception of the complainant's and defendant's credibility. The meeting will have been consensual, in a public place or in the presence of others, followed by a social relationship and commission of the sexual acts in private, absent disinterested witnesses able to testify as to consent. Defendants have similar problems of proof in such cases.

Pattern evidence does not bear on credibility. The evidence that Oliphant raped three other women does not tend to show that the complainant is a truthful person or that Oliphant is not.

A man who has raped a woman and is charged with that offense has reason to testify falsely without regard to whether he has raped other women; the incentive is no greater if this were not his first rape.[19]

Other allegations of rape do tend to make the complainant's story more believable, not because we know more about her or Oliphant's tendency to tell the truth, but because such evidence gives us reason to believe that he is the kind of man who would commit the charged offense. That, however, is precisely the purpose for which this evidence may not be admitted.

## IV

The characterization of Oliphant's relationships with the women as a plan designed to make proof of non-consent difficult and to hinder effective prosecution is based on the following factors:

1) There were similarities in Oliphant's conduct: Oliphant took the initiative in meeting the women; he met them on the street or sidewalk; the same automobile was used to transport them to the place where intercourse occurred; the conversations were similar in subject matter; the women were taken to unfamiliar sites; they were threatened with a dangerous weapon not shown; they were ordered to disrobe; Oliphant employed a similar manner of sexual stimulation and conversation regarding the woman's sexual response.

---

[19] While the law permits evidence of convictions to be introduced as bearing on credibility, *allegations* of other crimes are not admissible for this purpose.

There appears to be considerable agreement that even convictions have no bearing on truth telling. *See* the opinions of the justices in *People v Jackson,* 391 Mich 323; 217 NW2d 22 (1974).

2) The social relationships preceding intercourse were consensual.

3) Efforts were made to discourage the women from complaining to the authorities.

4) Oliphant's conduct was deceptive, especially in detouring from the destination originally agreed upon to the unfamiliar site where intercourse occurred.

5) All the women were white.

6) All four incidents occurred within a five-month period.

A

Actually, there were dissimilarities as well as similarities in Oliphant's conduct.[20]

[20] Two of the women, witnesses B and C, took the initiative by hitch-hiking. Witness A was walking to work and accepted a ride. The complainant was window-shopping when Oliphant stopped to talk to her.

Three of the women entered the automobile at the inception of the relationship. The complainant entered the automobile half an hour after she met Oliphant.

Two of the acts of intercourse occurred in the automobile; the other two in an apartment.

The topics of conversation varied. Witness A testified that they talked about the weather, about celebrating Christmas, which was the next day, and that Oliphant had asked her if she had ever tried marijuana and if she had ever dated blacks. The conversation with B related to the fact that they were both students. They also talked about marijuana and about blacks and whites dating. Witness C said they talked about her major in college, which Oliphant said was his major. They also talked about college and professors. Complainant testified that their conversation concerned racial prejudice in her home town. They talked about their attitudes toward meeting people, about how they both enjoyed dancing, about schools, her family, her high school, the atmosphere at the bar they patronized; complainant said her sister liked marijuana but that complainant had only tried it once.

While Oliphant is alleged to have threatened each of the witnesses, different or unspecified weapons were referred to.

Witnesses B and C were ordered to remove their clothes and to dance. Witness A and the complainant were ordered to remove their underpants.

Witness A was taken to a farming area, B and C to apartments in

Many of the points of similarity argued to the jury were not material to the issue of consent or the appearance of consent. The Court acknowledges that the facts "which tended to show a pattern in the actual sexual contact between defendant and the women [presumably the manner of sexual stimulation and conversation regarding the women's sexual response were] irrelevant and immaterial to establishing a scheme, plan or system to orchestrate events so as to indicate consent."

The Court rests its characterization (orchestration) and determination on the "striking" similarities in the testimony of the women, objective criteria. It appears, however, that the similarities —the man takes the initiative, the meeting is impromptu and in a public place, an automobile is used to transport the woman to an unfamiliar site and the man uses the same "line" with a number of women—are present in many social relationships which culminate in sexual acts and in many which do not.[21]

It is not the points of identity or the *modus operandi* of the other crimes evidence that give credibility to the complainant's testimony but the assertions of the other women that the other acts of intercourse were rapes. Without those assertions—which go only to propensity—the points of identity and *modus operandi* are not probative. They show simply that the defendant pursues college-age white women and that the pursuit

an unfamiliar part of town, and the complainant to a secluded residential area.

Oliphant was accompanied by another man when B and C were given rides, taken to the apartments and allegedly raped. He was alone throughout the relationships with A and complainant.

[21] *See* Tribe, *Trial by Mathematics: Precision and Ritual in the Legal Process,* 84 Harv L Rev 1329 (1971).

follows a common format: impromptu meeting, conversation, automobile ride, more conversation, intercourse.

The similarities of the encounters with the other women—unaccompanied by allegations that the sexual acts which resulted were not consensual—does not tend to prove any fact that a prosecutor would seek to establish. Evidence that Oliphant had, following a similar pattern, struck up relationships with other women who accompanied him to secluded places and engaged in sexual acts would, without the allegation that their participation was non-consensual, be exculpatory. Such evidence would show that Oliphant pursues and is sexually attractive to women.

The allegations that the sexual acts with the other women were non-consensual, all would agree, are in themselves inadmissible; they tend to show only a propensity to commit the charged offense. The pattern evidence does not tend to support the complainant's testimony; it is the allegations of rape which have that tendency. Since the pattern evidence is not probative without the allegations of rape and becomes probative only with those allegations, it is the inadmissible allegations which alone are probative.

The Court's characterization thus becomes the vehicle by which evidence otherwise inadmissible becomes admissible. The Court, seeking a principled explanation, declares that there is a pattern and that the pattern is deceptive, but cannot, apart from the inadmissible allegations of rape, distinguish this case from other situations where men and women, following a pattern of social conduct they have found successful in the past, engage in consensual sexual acts on either brief or extended acquaintance.

## B

Assuming that the consensual format of the relationships and the other points of similarity in Oliphant's conduct were material to the issue of whether the intercourse was consensual, it does not follow that because there were similarities there was a plan, or that if there was a plan its purpose was to create an appearance of consent, or that it did so.

It . is not reasonable to conclude that simply because there is a pattern there is a design, or that because the pattern is consensual the sexual acts were non-consensual. The conclusion is opposed to the ordinary experience of sexually active men and women who have sexual relations. with different partners over a period of time, having in retrospect a pattern in the manner of the encounter and the course of the relationship.

While it appears that Oliphant was deceptive in his relationships with the complainant and the other women and that he was in this manner able to transport them to unfamiliar sites where acts of intercourse occurred, there is no objective basis for concluding that his purpose was to give an appearance of consent rather than to induce the women to accompany him. Similarly, his threat to use a weapon may have been to secure prompt compliance with his demands rather than to give an appearance of consent.

Although all the women are white, that would not tend to create an appearance of consent.

The fact that all four incidents occurred within a five-month period indicates purposeful conduct; it does not indicate a purpose to create an appearance of consent.

The complainant's testimony that Oliphant

sought to discourage her from complaining to the authorities was inculpatory; it did not tend to create an appearance of consent on her part but of non-consent. The fact that a woman knows a man's name or identity does not support an inference or give the appearance that she consented to sexual intercourse with him.

The testimony of the other women regarding Oliphant's efforts to discourage prosecution does not tend to establish an element of the offense or rebut a defense but to show consciousness of guilt from which an inference of guilt may be drawn. Evidence of consciousness of guilt in other cases does not tend to show consciousness of guilt in this case and, accordingly, is not material or relevant.

Even if one concludes that the consensual format and Oliphant's deceptions were designed to give an appearance of consent, and to make non-consent difficult to prove, they could not in fact have done so. The deceptions, public meeting, small talk and automobile trip may have tended to show that this was a normal dating relationship. But the existence of such a relationship does not indicate that the woman consented to have sexual intercourse and therefore does not tend to negative non-consent or make non-consent difficult to prove.

It is not assumed by either men or women that when a woman accepts an invitation to socialize with a man and accompany him in an automobile that she has thereby indicated her consent to engage in sexual intercourse with him.

It would not be reasonable for the jury to infer that the complainant consented to have sexual intercourse with Oliphant simply because she spoke with him, entered his automobile and traveled with him to several places of public entertain-

ment. The arguably deceptive and contrived consensual format of the relationship would not tend, therefore, to support an inference of consent or to make non-consent difficult to prove.

A criminal scheme, plan or system may not be shown in the abstract. To be admissible, it must, minimally, tend to show a fact, other than propensity to commit crime, that is material and relevant. The fact evidenced by such other crimes evidence must be honestly in dispute and of sufficient importance so that the probative worth of the evidence may outweigh the otherwise unwarranted prejudice to the defendant in admitting such evidence.

While the testimony of the other women tends to corroborate the complainant's testimony that she was subjected to a methodology similar to that experienced by other women who claimed they were raped by Oliphant, neither the methodology nor the testimony that they were raped, although probative that Oliphant has a propensity to rape, tends to show that the complainant did not consent. The testimony of the other women shows that Oliphant uses force; it does not show that she did not consent; it is not probative of non-consent.

## V

The Court's opinion may encourage the police to attempt to locate other persons with whom an accused person once had a social and sexual relationship to determine whether they are willing to testify against him. If, for whatever reason, other persons are willing to do so, it is likely that there will be points of arguable similarity in the unearthed and charged relationships—in the manner in which the parties met, the car the accused drives, the restaurants and bars he frequents, the

small talk, the manner employed to arouse his own or the other person's libido, the sexual acts, and the subsequent relationship.

The decision to admit such exploitative testimony is tantamount to a decision to convict. Allowing trial judges a discretion to admit such evidence is equivalent to conferring on them a discretion to all but direct a verdict of guilty.

The Court states that it will not substitute its judgment for that of the trial judge. What has occurred in this case is so extraordinary that, in my judgment, if it is permitted at all, the appellate courts must assume a supervisory responsibility, case by case, to determine whether the other crimes evidence was properly admitted and to hear, even before trial, interlocutory appeals to decide whether such evidence may be admitted lest pleas of guilty to lesser offenses be exacted on the representation that such testimony will be offered and that the judge will admit it.

Judges will probably be called upon to admit such evidence in cases where the prosecutor feels strongly that the defendant is guilty and his case, without such evidence, is weak. In cases arising out of consensual social relations there will always be points of similarity and dissimilarity. The judge will therefore always have a basis for admitting the other crimes evidence, or excluding it.

The trial judge in this case had no basis for concluding that this was not a common consensual pattern except for the allegations of rape. In allowing admission of such evidence on a discretionary basis the Court is, in effect, conferring on trial judges authority to admit evidence based on their view of the credibility of the defendant, the complainant and the other women.

The judge's discretion will inevitably be exer-

cised based on the representations made to him
and his view of the credibility of the witnesses
simply because this Court has not delineated and
cannot delineate objective criteria for exercising
such discretion.

It may be asserted that a trial judge, in admit-
ting this evidence, is not making a final judgment
and that ultimately it is for the jury to decide
whether there is a pattern, whether a consensual
pattern is probative of non-consent and whether
the allegations of rape are to be believed. The jury
was not so instructed in this case, but, even if it
had been, the outcome would no doubt have been
the same. The reason why other crimes evidence is
generally excluded is because it precludes an objec-
tive assessment of the evidence by the jury.

Introduction of such evidence so transforms a
criminal prosecution as to require the most puncti-
lious appellate review lest the exception become
the rule as reported and unreported appellate
decisions monotonously come down "no abuse of
discretion".

## VI

The evidence of Oliphant's *modus operandi* was
first introduced as part of the people's case-in-chief
through the testimony of the complainant. While
the defendant added his testimonial version, it was
the prosecutor, not the defendant, who "opened
the door".

I appreciate that the prosecutor is obliged to
show the entire transaction, the evidence tending
to oppose as well as that tending to support a
conviction.

Where, however, the prosecutor contends that,
because the defendant's format for pursuit of

women tends to create an appearance of consent and is therefore exculpatory, he should be permitted to offer evidence of other such pursuits by the defendant, the simpler and fairer means of accomplishing the stated purpose, assuming agreement with the premise that the format is exculpatory, would be to give the defendant the option of having such exculpatory evidence limited or excluded, or of having the other crimes evidence admitted.

Evidence of the relative civility of the initial relationship was not essential to either the prosecution or defense. Rather than exposing the defendant to the highly prejudicial other crimes evidence, which made it impossible for the jury to view objectively the competing testimony on the issues of force and consent, the defendant and the people of this state would have been better served by excluding altogether the facts preceding the commencement of the trip to the place where the sexual acts occurred.

The prosecutor, defense counsel, complainant and defendant could have been instructed to confine the testimony regarding the circumstances of the initial relationship to a simple statement, which could even have been made by the judge, that the complainant had accepted an invitation from the defendant to ride with him in his automobile. The judge could state that the circumstances of their relationship before that time will not be disclosed because they may tend to create an unfavorable impression of either the complainant or the defendant, and could instruct the jurors not to speculate whether it was one or the other who would be viewed unfavorably by fuller disclosure of the preceding relationship.

The complainant could still have told her story

that she was supposed to have been taken one place and was instead taken to another, where she was raped. The defendant could then have told his story. The jury would then decide which version to accept without the court having put its thumb, nay both feet, on the scales of justice.

I do not mean to suggest that such truncated disclosure is desirable, but at least the defendant would have had a chance, as would the prosecutor, before a jury unbeguiled by the allegedly "orchestrated" events.

Another approach would be to recognize that even if a man has a plan to orchestrate events to give an appearance of consent, there will of necessity be a minimal social relationship that is not contrived to that end but to the simpler purpose of meeting women and inducing them to accompany him to a place where they can be solicited for sexual purposes. The judge might exclude evidence of so much of the relationship as he determines is contrived (orchestrated) to give the appearance of consent. I appreciate that there are no objective criteria for making such determination, but neither are there for making the determination made by the judge and approved by this Court in this case.

In balancing any unfairness to the prosecution from any inferences that may be drawn as a result of the consensual nature of the relationship against the unfairness to the defendant from the inferences that will be drawn as a result of the allegations of other rapes, the accommodation here suggested would, I think, recognize the legitimate interest of the prosecution to be protected from contrived evidence and the right of the defendant to a fair trial. This approach has the advantage, in comparison with the first suggestion (beginning

the story in the middle and a cautionary instruction), that the jury need not be apprised that evidence has been excluded, the jury will have a more complete history of the relationship, and, since the complainant and defendant are allowed to testify more fully, there will be a more meaningful basis for cross-examination and jury assessment of credibility.

## VII

The Legislature has declared that the sexual propensities of a complainant in a rape case are not admissible, paralleling the rule barring the admission of propensity evidence against defendants in criminal cases.

The exception created in the affirmance of this conviction will, if emulated in other cases, provide a basis for engrafting exceptions on the newly declared policy.

If the consensual nature and pattern of the relationship is deemed probative of non-consent, it is also arguably probative of consent. Just as the people will seek to identify similarities in the social and sexual histories of defendants, defendants will invoke the court's ultimate power to control the admission of evidence, even if exercise of that power conflicts with a statute,[22] and will seek out striking similarities to establish a pattern of complainant behavior supportive of defendant's assertion that the sexual relationship was consensual.

While it is always possible to rationalize distinctions, it will be difficult to reconcile on a principled basis treating defendants differently from complainants.

---

[22] *Perin v Peuler (On Rehearing)*, 373 Mich 531; 130 NW2d 4 (1964).