# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

STEVEN JOSEPH REMBISH,

        Defendant-Appellant.

UNPUBLISHED
January 8, 2015

Nos. 308738 and 308916
Saginaw Circuit Court
LC Nos. 11-035717-FC
             11-035679-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JONATHON LEROYCE JONES,

        Defendant-Appellant.

No. 308929
Saginaw Circuit Court
LC No. 11-035716-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ROBERTO LEWIS RODEA,

        Defendant-Appellant.

No. 308935
Saginaw Circuit Court
LC No. 11-035678-FC

---

Before: MURRAY, P.J., and O'CONNELL and BORRELLO, JJ.

PER CURIAM.

These four consolidated cases arose from two separate jury trials and two separate shootings that resulted in the death of two individuals. In Docket No. 308738, which involved the death of Sean Stennett, defendant Steven Rembish appeals by right his convictions for first-

-1-

degree premeditated murder, MCL 750.316, conspiracy to commit first-degree premeditated murder, MCL 750.316 and MCL 750.157a, assault with intent to murder (AWIM), MCL 750.83, discharging a firearm at a dwelling, MCL 750.234b, carrying a dangerous weapon with unlawful intent, MCL 750.226, felon in possession, MCL 750.224f, and six counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b.

In Docket No. 308929, defendant Jonathon Jones, who was also charged in the murder of Sean Stennett and tried with Rembish, appeals by right his convictions for first-degree murder, conspiracy to commit murder, AWIM, discharging a firearm at a dwelling, carrying a dangerous weapon with unlawful intent, and five counts of felony-firearm.

In Docket No. 308916, Rembish appeals by right his convictions for first-degree premeditated murder, conspiracy to commit first-degree premeditated murder, felon in possession of a firearm, discharging a firearm at a dwelling, discharging a firearm from a vehicle, MCL 750.234a, carrying a dangerous weapon with unlawful intent, felon in possession of a firearm, and six counts of felony-firearm, in a case pertaining to a second shooting that resulted in the death of Dawn Ricklefs.

In Docket No. 308935, defendant Roberto Rodea, who was also charged in the shooting of Dawn Ricklefs and tried with Rembish, appeals by right his convictions for first-degree premeditated murder, conspiracy to commit first-degree murder, discharging a firearm at a dwelling, discharging a firearm from a vehicle, two counts of carrying a dangerous weapon with unlawful intent, and six counts of felony-firearm.

We affirm all three defendants' convictions and sentences.

## I.  DOCKET NOS. 308738 AND 308929

## A.  SUFFICIENCY OF THE EVIDENCE

Defendants Rembish and Jones both argue that the evidence was insufficient to support their convictions stemming from the death of Sean Stennett on December 2, 2010.  We review a challenge to the sufficiency of the evidence de novo on appeal.  *People v Cline*, 276 Mich App 634, 642; 741 NW2d 563 (2007).  We view the evidence in a light most favorable to the prosecution to determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt.  *People v Hoffman*, 225 Mich App 103, 111; 570 NW2d 146 (1997).  Circumstantial evidence and reasonable inferences drawn therefrom are sufficient to prove the elements of a crime.  *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).

Both defendants maintain that they were not the individuals who committed the shooting and the other offenses.  Contrary to defendants' contentions, the evidence at trial was sufficient to prove that both defendants were involved in the shooting.

The evidence established that Stennett and Kaiti Allen were shot in Allen's home on December 2, 2010.  Allen testified that at approximately 2:30 a.m., Stennett heard a knock at her front door.  Allen went to the door, looked out a window, and saw two men.  In the meantime, Stennett grabbed her and threw her to the ground.  She heard shots being fired and was grazed by

a bullet. The men tried to enter the apartment; however, Stennett held the door shut with his feet, and the men ran away. Stennett received several gunshot wounds in the altercation and was taken to the hospital, where he died.

Two bullets were recovered from Stennett's body. These bullets, as well as bullets and spent shell casings found at the scene, were linked to a .45 caliber Glock brand pistol owned by Sean Berg, one of defendants' acquaintances.[1] Berg, testifying under a grant of immunity, stated that he looked for the gun shortly after the shooting, but the gun was missing. He received calls from both Rembish and Jones, who told him that they had used the gun to shoot a male near Berg's home. Berg maintained that in the first call, Jones told Berg that the two had used his gun to kill someone, that the gun was safe, and that Jones intended to buy Berg a new gun, or to replace the firing pin or the barrel. In another call, Rembish asked Berg to meet him. When Rembish arrived at Berg's driveway, Rembish walked up to him, gave him a "high five" and, smiling, said, "Smedler down."[2] Like Jones, Rembish stated that they would give Berg a new gun, or a new firing pin or barrel. Jones later returned the gun to Berg. After a series of transfers, the police recovered the gun.

Berg testified that both defendants told him that they went to Allen's residence. Berg understood defendants to say that "[s]ome kind of struggle occurred at the door. And they just fired through the door. And then they ran off." Berg testified that defendants did not say who actually fired the shots. Instead, defendants indicated that if no one knew who fired the shots, then no one would get in trouble.

Berg further testified that defendants told him that they believed the person they shot had molested Rembish's girlfriend, Danielle Kuebler, when she was young. Danielle Kuebler testified that she had told one of Rembish's friends about an individual who had molested her.

In addition to Berg and Kuebler, defendant Rembish's niece provided testimony that implicated Rembish in the shooting. The niece testified that she spoke with Rembish before his arrest, that he told her "he was going to man up to his mistake," and that he was not going to let anyone "go down" for what he did.

Viewed in the light most favorable to the prosecution, the trial testimony was sufficient to prove that both defendants were involved in the murder and the other offenses for which they stand convicted. Moreover, the testimony established a motive for the murder. Although providing a motive is not necessary to support a conviction, see *People v Oliphant*, 399 Mich 472, 489; 250 NW2d 443 (1976), the testimony indicated that Rembish and Jones intended to kill the person they believed to have molested Rembish's girlfriend.

---

[1] A Michigan State Police forensic examiner testified that he conclusively matched the casings to the handgun. The recovered bullets had the same rifling characteristics and caliber as the handgun barrel, but the examiner could not conclusively state that they came from the same handgun.

[2] Berg testified that, among his group of friends, "smedler" was used to denote a child molester.

In addition, contrary to Jones's contention, the prosecution did present adequate evidence of conspiracy and premeditation. The evidence concerning Jones's and Rembish's actions before and after the killing, in particular with respect to the murder weapon itself, provided evidence of an agreement to commit the offenses, thus supporting the conspiracy conviction. *People v Justice (After Remand)*, 454 Mich 334, 345-346; 562 NW2d 652 (1997). With respect to the showing of premeditation, the evidence that one or both of the defendants took the gun from Berg's closet and walked to Allen's home, where they knocked on the door and then shot, provides support for a finding that they had enough time to contemplate their actions so as to support a finding that the murder was premeditated. *People v Abraham*, 234 Mich App 640, 656; 599 NW2d 736 (1999). The comments about killing a "smedler" indicate that the shooting was intentional. See *People v McRunels*, 237 Mich App 168, 181; 603 NW2d 95 (1999) ("Because of the difficulty of proving an actor's state of mind, minimal circumstantial evidence of intent to kill is sufficient.").

With respect to the assault convictions relating to the shooting of Allen, contrary to Jones's argument, the prosecutor did not have to prove specific intent. Under the doctrine of transferred intent, it is sufficient for the prosecutor to show that defendant had the requisite state of mind to kill; it is not necessary to show that defendant's state of mind was directed at a specific person or the actual victim. *Abraham*, 256 Mich App at 270; *People v Lawton*, 196 Mich App 341, 350-351; 492 NW2d 810 (1992); *People v Youngblood*, 165 Mich App 381, 388; 418 NW2d 472 (1988).

As to the question of whether the lack of more information as to which defendant actually used the weapon during the shooting, the prosecution presented sufficient evidence to support the convictions under an aiding and abetting theory. "The requisite intent for conviction of a crime as an aider and abettor is that necessary to be convicted of the crime as a principal." *People v Mass*, 464 Mich 615, 628; 628 NW2d 540 (2001) (internal quotation marks and citation omitted).

> To support a finding that a defendant aided and abetted a crime, the prosecutor must show: (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time [the defendant] gave aid and encouragement. [*People v Robinson*, 475 Mich 1, 6; 715 NW2d 44 (2006) (internal quotation marks omitted).]

An aider and abettor's state of mind may be inferred from the facts and circumstances. These can include "a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime." *People v Carines*, 460 Mich 750, 757-758; 597 NW2d 130 (1999) (internal quotation marks and citation omitted). Here, evidence was presented sufficient to support either defendant's convictions under such a theory.

B. DISCOVERY

-4-

Defendant Rembish next argues that he was "surprised and unfairly prejudiced" by testimony of various witnesses concerning statements allegedly made by Kayla Kuebler shortly after the shooting that implicated both he and Jones. He also argues that he should have been able to question further the officer who interviewed Kayla, apparently in order to discredit these inculpatory statements.

There is no general constitutional right to discovery in a criminal case. *Weatherford v Bursey*, 429 US 545, 559; 97 S Ct 837; 51 L Ed 2d 30 (1977); *People v Elston*, 462 Mich 751, 765; 614 NW2d 595 (2000); *People v Stanaway*, 446 Mich 643, 664; 521 NW2d 557 (1994). Rather,

> Defendants have a due process right to obtain evidence in the possession of the prosecutor if it is favorable to the accused and material to guilt or punishment. *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963); *People v Carter*, 415 Mich 558, 593; 330 NW2d 314 (1982). Material has been interpreted to mean exculpatory evidence that would raise a reasonable doubt about the defendant's guilt. *United States v Agurs*, 427 US 97, 104; 96 S Ct 2392; 49 L Ed 2d 342 (1976). The prosecution must turn over such evidence regardless of whether the defendant makes a request. *Id.* . . . The test for whether the material should have been provided . . . is "whether it contains information that probably would have changed the outcome of [the] trial." [*Pennsylvania v Ritchie*, 480 US 39, 58; 107 S Ct 989; 94 L Ed 2d 40 (1987)]. . . . [*Stanaway*, 446 Mich at 666.]

Here, Kayla Kuebler's statements were not exculpatory. Rather, the only inference to be made from the testimony was inculpatory. Defendant thus cannot show he was entitled to greater discovery of what these witnesses would testify to at trial. In addition, Kayla Kuebler testified at trial specifically about her alleged statement, and in fact maintained that she did not make the statement attributed to her. Therefore, Rembish's assertion that counsel had no opportunity to explore the circumstances surrounding her statement is without merit. Moreover, even if the other witnesses' statements should have been found inadmissible, the fact that counsel could question both the witnesses and Kayla renders any prejudice minor.

In addition, Rembish has not presented any argument or case law in support of his claim of error concerning his inability to further question the investigating officer about the witnesses' statements. "It is axiomatic that where a party fails to brief the merits of an allegation of error, the issue is deemed abandoned by this Court." *Prince v MacDonald*, 237 Mich App 186, 197; 602 NW2d 834 (1999). See also *Peterson Novelties, Inc v Berkley*, 259 Mich App 1, 14; 672 NW2d 351 (2003) (instructing when a party gives an issue cursory treatment, with little or no supporting authority, the issue is deemed abandoned). Moreover, Rembish has not stated how any further questioning of the officer would have affected the defense's arguments or the outcome of the trial.

## C. PROSECUTOR MISCONDUCT

Defendant Rembish next argues that he is entitled to a new trial due to prosecutor misconduct. Specifically, he argues that the prosecutor improperly used statements by Danielle

Kuebler, which were admitted as prior inconsistent statements pursuant to MRE 613(b), as substantive evidence during closing argument. Rembish also maintains that the prosecutor improperly vouched for Sean Berg during closing arguments. Defense counsel did not object to these portions of the prosecutor's closing arguments, and thus this issue is not preserved. *People v Cameron*, 291 Mich App 599, 617; 806 NW2d 371 (2011). "In order to avoid forfeiting an unpreserved error, a defendant has the burden of establishing that the (1) error occurred, (2) the error was plain, i.e. clear or obvious, and (3) the plain error affected substantial rights." *People v Osby*, 291 Mich App 412, 414; 804 NW2d 903 (2011) (internal quotation marks and citation omitted). "Review of alleged prosecutorial misconduct is precluded unless the defendant timely and specifically objects, except when an objection could not have cured the error [as when a curative instruction would have been ineffective], or a failure to review the issue would result in a miscarriage of justice." *People v Callon*, 256 Mich App 312, 329; 662 NW2d 501 (2003) (alteration added).

With respect to Danielle Kuebler's alleged statements during the police investigation, a large part of which she claimed not to remember at trial, we note that the parties agreed to the use of a video recording of the interview during trial, although it was not admitted into evidence. The parties also agreed that this evidence could only be used as impeachment evidence. After considering the challenged closing argument statement referring to the interview, we conclude that the statement, while not overtly improper, could have been confusing to the jury. Nonetheless, the clear thrust of the argument was that because Danielle was lying about the conditions surrounding the questioning, anything she testified to that was beneficial to the defense, such as her contention that Rembish was injured while he and Jones were just playing around "like they always do" rather than in an attempt to run away from the scene of a crime, should not be credited. The trial court correctly refused to furnish the transcript to the jury upon request during deliberations because the evidence could only be used for impeachment. Moreover, the trial court both instructed the jury that the lawyers' statements, arguments, and questions were not evidence and that whether to believe witnesses was a question for the jury to decide, and also provided a specific jury instruction concerning the proper use of Danielle Kuebler's prior statements. We thus find that defendant is not entitled to relief on this issue.

We similarly find Rembish's allegation concerning improper bolstering of Sean Berg's testimony to be without merit. Defendant is correct that a "prosecutor cannot vouch for the credibility of his witnesses to the effect that he has some special knowledge concerning a witness' truthfulness." *People v Bahoda*, 448 Mich 261, 276; 531 NW2d 659 (1995). However, a prosecutor may comment on his own witnesses' credibility during closing argument, especially when there is conflicting evidence and the question of the defendant's guilt depends on which witnesses the jury believes." *People v Thomas*, 260 Mich App 450, 455; 678 NW2d 631 (2004). Such is the case here. The prosecutor did not improperly vouch for Sean Berg by implying that the prosecutor had special knowledge of Berg's veracity.

Defense counsel entered into a lengthy attack on Berg's credibility during closing argument. Counsel argued that Berg had a very good motive to fabricate his story, both because he received a grant of immunity in the instant case when facing a number of criminal charges and because he was facing additional unrelated felony charges in Bay County and would likely get a favorable sentencing deal for testifying in the instant case. Defense counsel specifically stated that, because of these other offenses, Berg had a motivation to lie even when he first was

questioned by and cooperated with the investigating officers. In rebuttal, the prosecutor agreed that Berg was getting a benefit, although the prosecutor tired to minimize the extent of Berg's exposure. However, the prosecutor also reiterated that Berg did not have anything to do with the murder, and also indicated that seeking the grant of immunity was calculated in order to catch the bigger "fish." Nothing in the challenged statements indicates any secret knowledge on the part of the prosecution. Defendant is not entitled to relief.

## D. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant Jones argues that his trial counsel was ineffective for failing to object to the use of Rembish's out-of-court statements to Sean Berg and Danielle Kuebler in the case against Jones. Jones also argues that, if these statements were properly admissible, trial counsel was ineffective for failing to request a special jury instruction informing the jury that the accomplice's testimony should be viewed with particular skepticism. Because defendant did not move for a new trial or a *Ginther*[3] hearing, this issue is unpreserved, and this Court's review is limited to errors apparent from the record. *People v Lockett*, 295 Mich App 165, 186; 814 NW2d 295 (2012).

> The determination whether a defendant has been deprived of the effective assistance of counsel presents a mixed question of fact and constitutional law. The trial court's factual findings are reviewed for clear error, while its constitutional determinations are reviewed de novo. [*Id.* at 186 (citation omitted).]

To establish an ineffective assistance of counsel claim, a defendant must show that counsel's performance was below an objective standard of reasonableness under prevailing professional norms and that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *People v Trakhtenberg*, 493 Mich 38, 51, 56; 826 NW2d 136 (2012); *People v Davenport*, 280 Mich App 464, 468; 760 NW2d 743 (2008). "A defendant may meet this burden even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Trakhtenberg*, 493 Mich at 56 (internal quotation marks and citation omitted). Effective assistance of counsel is presumed. *People v LeBlanc*, 465 Mich 575, 578; 640 NW2d 246 (2002). Nor will this Court generally second-guess counsel regarding strategy or assess competence with the benefit of hindsight. *People v Rice*, 235 Mich App 429, 445; 597 NW2d 843 (1999).

Defendant Jones maintains that counsel should have objected to Rembish's alleged statements to Sean Berg, which included his "smedler down" comment, a statement that Rembish was going to take responsibility for the shooting, a comment that Rembish (or Jones) fired through the door, and Rembish's comments after the shooting as to where the firearm was located. Jones also maintains that counsel should have moved to exclude Danielle Kuebler's testimony that, sometime after midnight December 2, 1010, when she noticed a scratch on

---

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

Rembish's hand, he told her that it happened wrestling and running through yards and jumping fences.

Jones has not shown that he is entitled to relief. Hearsay, an out-of-court statement used for the matter asserted, is generally inadmissible. MRE 801(c); MRE 802. However, one of the exceptions to this rule occurs when the declarant is unavailable and the statement is against the declarant's interest. MRE 804(b)(3). In the instant case, Rembish's statements, both to Danielle and Berg, fell within this category. Although Jones maintains that the statements should not have been admitted against him, he acknowledges that our Supreme Court has found this to be permissible under certain circumstances. In *People v Taylor*, 482 Mich 368, 376; 759 NW2d 361 (2008), our Supreme Court reiterated that a codefendant's out-of-court statement implicating both the codefendant and the defendant is admissible in a criminal case under the hearsay exception for statements against penal interest when the statement can be shown to bear "sufficient indicia of reliability," such as where the statement was voluntarily given, made contemporaneously with the events, made to someone to whom the declarant would likely speak the truth, and uttered spontaneously without prompting or inquiry. The *Taylor* Court also referred to circumstances suggesting that any statement would be unreliable, such as when the statement was made to the police or in response to questioning, where the statement places the blame primarily on the codefendant, or when it can be shown that the declarant had a motive to lie. *Id*. Here, the statements were made spontaneously, relatively contemporaneously, to Rembish's ex-girlfriend and to the codefendants' mutual friend, and Rembish does not appear to have had a motive to lie. Moreover, Rembish did not place the blame on Jones, but refused to tell Berg which one of them had actually shot the victim.

Given these facts, defendant cannot show by evidence on the record that, had counsel objected to the introduction of these statements, the trial court would have upheld counsel's objection. In general, counsel is not ineffective for failing to make motions or objections that would be futile. *People v Milstead*, 250 Mich App 391, 401; 648 NW2d 648 (2002). Thus, defendant has not shown that counsel acted unreasonably when counsel did not pursue a likely meritless objection. Nor, because of the admissibility of the statements, can defendant show that, had counsel objected, it was reasonably likely that a different result would have occurred.

Defendant also chastises counsel for failing to request a specific accomplice instruction, such as that provided in CJI2d 5.6. However, because Rembish did not provide testimony, this instruction was inapplicable, and the jury was provided the standard instruction concerning witness testimony generally. Jones cannot show that counsel unreasonably failed to request an inapplicable instruction; nor can he show prejudice.

### E. EXPERT WITNESS QUALIFICATION

Defendant Jones next argues that the trial court should not have qualified Saginaw Police Detective Timothy Fink as an expert witness in the area of cellular phone records and data. An appellate court "reviews a trial court's rulings concerning the qualifications of proposed expert witnesses to testify for an abuse of discretion." *Woodard v Custer*, 476 Mich 545, 557; 719 NW2d 842 (2006). An appellate court also reviews for an abuse of discretion a trial court's decision whether to admit evidence. *Surman v Surman*, 277 Mich App 287, 304-305; 745 NW2d 802 (2007). An abuse of discretion occurs when a trial court selects an outcome falling outside

-8-

the range of reasonable and principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). To the extent that this Court's review of an evidentiary issue "requires interpretation of the Michigan Rules of Evidence, an issue of law is presented, which this Court reviews de novo." *People v Dobek*, 274 Mich App 58, 93; 732 NW2d 546 (2007).

Defendant has not shown that the trial court abused its discretion when it qualified Fink as an expert on the matter of cell phone record analysis. At trial, the prosecutor sought to introduce the cell phone records for defendants Rembish and Jones, and Sean Berg, and wanted to have Fink explain the timing of certain phone calls among and between the three, as well as provide limited location evidence. To that end, Fink provided testimony that he had obtained the records in their raw form from the companies, and that he had provided this data to defense counsel as well. He then made lists of calls relevant to the instant case, simplified the data to a form less unwieldy, and then used these to discuss the calls made among the three and at which times the calls were made. He also testified that the calls were made within the same general geographical area, which was in the middle of an overlapping area between two cell towers. All of the underlying records and lists, which were specifically referenced by Fink during his testimony, were admitted into evidence without objection.

Given that the underlying data consisted of undisputed facts, with the possible exception of the extent of the overlapping cell tower areas that Fink relied on to provide testimony about when the calls occurred and from what general area, defendant's argument is without merit. Fink testified that he had gone to a seminar where he was taught to analyze this data, and he provided a summary of what he had learned. While much of the data did not "require" an "expert" explanation and could have been reviewed de novo by the jurors, the testimony concerning the phone location arguably was outside the knowledge base of the average lay person. While it is true that proffering an expert who has no knowledge of a subject is violative of MRE 702 and thus not admissible at all, *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 789; 685 NW2d 391 (2004), generally, "'[g]aps or weaknesses in the witness' expertise are a fit subject for cross-examination, and go to the weight of his testimony, not its admissibility.'" *Wischmeyer v Schanz*, 449 Mich 469, 480; 536 NW2d 760 (1995), quoting *People v Gambrell*, 429 Mich 401, 408; 415 NW2d 202 (1987). We find this to be the case here. It was up to the jury to decide whether Fink's training provided a sufficient foundation from which to believe his testimony concerning the timing and location of the relevant phone calls.

## II. DOCKET NOS. 308916 AND 308935

### A. SUFFICIENCY OF THE EVIDENCE

Defendants Rembish and Roberto Rodea challenge the sufficiency of the evidence in connection with the shooting death of Dawn Ricklefs at the Corner Lounge bar on February 11, 2011. We conclude that the evidence was sufficient to support the convictions.

At trial, a number of witnesses testified that defendants Rembish and Rodea were involved in a fight at the Corner Lounge after they and others went to the location to celebrate a birthday. After the fight, the two were ejected from the bar. Witnesses heard Rodea stating that he had lost some cocaine, and the witnesses testified that both he and Rembish threatened to return and "shoot up" or "spray" the bar. The two drove away in Rembish's car – a light blue

1986 Oldsmobile Calais – that Sean Rembish had purchased a week before. Witnesses then testified that, between 15 and 40 minutes after the fight ended, the Corner Lounge was struck by multiple bullets. Between 8 and 14 individuals were inside at the time, including Dawn Ricklefs. She was struck by two of the bullets, in the chest and in the shoulder, and died as a result of her injuries. Another patron was grazed in the head. A witness stated that, after the shooting, he went outside where he saw a car drive away from the bar with its headlights turned off. The car's taillights matched that of the photographs of Rembish's car. Still other witnesses testified that other shots were fired at approximately 1:15 a.m. at the Maple Gardens Bar, which was located near the Corner Lounge.

Sean Berg testified that he had a conversation with Rembish on Saturday, February 19, 2011. Rembish told Berg that he had just taken his car to "the farm" because he knew the police were looking for it. Rembish also told Berg that he had taken his gun out to the swamp and disposed of it.[4] Rembish told him that he planned to wait for the police to arrive and asked Berg to take care of Rembish's family. At approximately the same time, Berg received a call from Rodea, who told him that Rodea had "messed up," asked Berg to take care of Rodea's children, and stated that he was probably going away for the rest of his life. Rodea told Berg about the fight, that he had lost some cocaine at the bar, and that Rodea was "mad" and wanted to go back and get into a fight.

Rembish's girlfriend (Danielle Kuebler) testified that, prior to the shooting, Rembish had hidden a handgun, later matched to the type used in the shooting, in the fireplace of their home. Kuebler stated that at approximately 12:00 a.m., Rembish woke her up when he returned to the home. He came to the bedroom but, because she was mad at him for staying out late, she told him to leave. She then heard the fireplace open. She thought that Rembish remained out in the living room, but admitted that she did not know where Rembish was for approximately an hour to an hour and a half, when he eventually returned to the bedroom. Danielle Kuebler also testified that, after the police had begun questioning others, she witnessed Rembish smash his cell phone in the driveway. He later wrote her a letter apologizing for putting her through stress, which she took to mean the stress of having her home searched. She was also questioned concerning whether Rembish had admitted that he had been involved in the shootings, and she stated that Rembish's story kept changing, but that he admitted involvement in the fight.

Detective Fink testified that he had analyzed the phone records of Berg, Rodea, and Rembish. Among the evidence presented was the finding that calls were made from Rembish and Rodea's phones in the vicinity of the Maple Gardens bar shortly after the 911 call reporting the shooting was placed. In addition to the phone evidence, witness testimony tied Rembish to a handgun model previously in his possession that had a very high probability of being the same model used in the shooting. Testimony placed the same car model as Rembish's at the scene of the Corner Lounge shooting.

Motive for the crime, while not essential to the prosecutor's case, see *Oliphant*, 399 Mich at 489, was shown in the loss, or theft, of Rodea's cocaine and in being ejected from the bar.

---

[4] Rembish's car was later located at the farm by police.

And testimony that Rembish told Rodea after the fight, "if you don't get your stuff back everybody in this bar is going down, I mean everybody," provides evidence of a specific intent to return and harm people, and also provides evidence of the agreement necessary to support the conspiracy conviction. Similarly, witnesses heard Rodea directly exclaim that he planned to come back and spray the bar with bullets. Witnesses further stated that they believed he intended to make good on his threat. Contrary to Rodea's claim that he had no idea that the Maple Gardens bar even existed, phone records placed both his and Rembish's phones at the bar very shortly after the 911 call from the Maple Gardens shooting was made at 1:22 a.m.

In addition, contrary to defendants' arguments, the prosecutor did not have to prove specific intent to shoot Ricklefs in order to establish that Rembish or Rodea was guilty of first-degree premeditated murder. *Abraham*, 256 Mich App at 270; *Lawton*, 196 Mich App at 350-351; *Youngblood*, 165 Mich App at 388. Evidence that Rembish or Rodea fired several shots into the bar at a time when people were almost certain to be present was evidence of an intent to kill. Evidence that Rembish and Rodea had threatened the bar patrons with exactly what later occurred because Rodea could not find his cocaine, that Rembish went back to his home and retrieved the weapon, and that the pair then drove back to the bar, was evidence that defendants acted with premeditation and deliberation. Therefore, the evidence was sufficient to prove the elements of first-degree murder, either as a principle or as an aider and abettor, *People v Robinson*, 475 Mich 1, 6; 7 15 NW2d 44 (2006), and to show the agreement necessary for the conspiracy convictions, *Justice* (*After Remand*), 454 Mich at 345-346.

In addition, the fact that no direct evidence linking Rodea to the firing of the weapon was presented does not mean that he is entitled to relief. Enough circumstantial evidence was presented to show, when viewed in the light most favorable to the prosecution, that he had at least joint control over its use. This was sufficient both to support the felony-firearm convictions, see *People v Johnson*, 293 Mich App 79, 82-83; 808 NW2d 815 (2011), and to support Rodea's other convictions at the least as an aider and abettor, *People v Robinson*, 475 Mich 1, 6; 715 NW2d 44 (2006).

## B. ALLEGED JUROR MISCONDUCT

Defendant Rodea next argues that he is entitled to a new trial because one of the jurors lied during voir dire when asked whether she knew any of the parties involved and whether she had prior information about the case that had caused her to already make up her mind concerning the outcome. Defendant has not shown that he is entitled to relief due to alleged falsehoods by one of the jurors during voir dire.

"Jurors are presumptively competent and impartial, and the party alleging the disqualification bears the burden of proving its existence." *People v Johnson*, 245 Mich App 243, 256; 631 NW2d 1 (2001) (citations omitted). A new trial may be granted where juror misconduct materially affected the substantial rights of the aggrieved party. MCR 2.611(A)(1)(b). "A moving party must present actual proof of prejudice on the part of that juror or establish that the moving party would have challenged for cause or otherwise dismissed the juror in question had the truth been revealed prior to trial." *Hunt v CHAD Enterprises, Inc*, 183 Mich App 59, 64; 454 NW2d 188 (1990).

-11-

Defendant presents two affidavits by the juror's coworkers. In the first, an assertion is made that other coworkers had told the affiant that the juror spoke about the trial and stated that she knew of defendant through a number of sources, including defendant's cousin, who apparently works with the juror. A second affidavit, which is not properly notarized, states that the juror told the affiant and defendant's cousin details about the case. This second affidavit also states that the juror had told them that she had made up her mind after the first day of trial. With respect to whether the juror spoke of the trial to others, this Court has held that a juror's violation of the trial court's express instruction not to discuss the case during trial is not, by itself, grounds for a new trial. *People v Rohrer*, 174 Mich App 732, 737; 436 NW2d 743 (1989).

With respect to defendant's next claim of error, we find that defendant waived the claim of error concerning the juror's prior contact, if any, with him. Had the acquaintance been mutual, one could reasonably presume that defendant knew at the time of jury selection that the juror knew him. Yet, he did not object to her being seated on the jury, or otherwise inform the court of any relationship with the juror. Thus, if the juror and defendant were actually acquainted, defendant is essentially improperly harboring error as an appellate parachute. See *People v Kowalski*, 489 Mich 488, 504-505; 803 NW2d 200 (2011). If it is the case that the juror only knew of defendant, which appears to be the case at least as set forth in the affidavits, she did not, strictly speaking, lie during voir dire, or at least may not have deliberately mislead the court. In addition, neither of the two affidavits provides any indication that her knowledge of defendant through others, if true, prejudiced him. Nothing presented supports a finding that she was biased against defendant due to her knowledge of him.

With respect to defendant's claim that he is entitled to a new trial due to juror bias as evidenced by the juror's alleged statements that she had already made up her mind by the first day of trial, defendant cannot show that he is entitled to relief. The trial court specifically instructed the jury to only consider the evidence that was admitted at trial. Jurors are presumed to follow their instructions. *People v Powell*, 303 Mich App 271, 274; 842 NW2d 538 (2013). Moreover, even if an evidentiary hearing were held, the juror could not testify about this intrinsic matter. "[Juror m]isconduct can be demonstrated with evidence pertaining to outside or extraneous influences, but cannot be demonstrated with evidence indicating matters that inhere in the verdict, such as juror thought processes and inter juror inducements." *People v Messenger*, 221 Mich App 171, 175; 561 NW2d 463 (1997).

## C. PROSECUTOR MISCONDUCT

Defendant Rodea raises a number of allegations of prosecutor misconduct, all of which are unpreserved. He first argues that the prosecutor improperly questioned the jurors during voir dire about the concept of transferred intent by using highly prejudicial examples, such as the Columbine and 9/11 tragedies, to illustrate the concept. However, while the prosecutor's comments and follow-up inquiries may cite extreme examples, they do exemplify the doctrine of transferred intent and, in particular, the idea that one need not have any specific victim in mind to be guilty of murder. See *Abraham*, 256 Mich App at 270. The comments and questions fell within the range of matters necessary to determine whether a prospective juror should be excused and were thus generally permissible. See *People v Bell*, 209 Mich App 273, 278; 530 NW2d 167 (1995). And, contrary to defendant's assertion, the prosecutor did not draw a direct correlation

between these incidents and defendants' behavior in the instant case. Defendant cannot show that he is entitled to relief.

Rodea also argues that the prosecutor committed misconduct when he failed to disclose prior to trial the contents of two letters written by defendant Rembish after his arrest. As discussed above, there is no general constitutional right to discovery in a criminal case. *Stanaway*, 446 Mich at 664. Rather, there is a due process right to obtain evidence in the possession of the prosecutor if it is favorable to the accused and material to guilt or punishment. Specifically, the prosecutor introduced two letters written by codefendant Rembish. One letter was to his niece, Brittany Kollman. The letter could be read to imply that Rembish is not guilty, and the letter also maintains that "all of us" would not be in the situation were it not for Sean Berg's statements to the police. This could arguably be read as partially exculpatory, even concerning Rodea, if not for the fact that it does not contain a direct claim of innocence. Defendant has not shown that the failure to produce this letter constituted wrongdoing on the part of the prosecution or was material or prejudicial to Rodea's defense.

The second letter, written to Danielle Kuebler, was not read into the record in its entirety. The pertinent part the prosecution wished to introduce concerned an apology to her for what he was putting her and the family through. Nothing on the record indicates that this evidence was exculpatory. Rodea's concurrent argument that the prosecution failed to present to the defense a purported statement he made to Sean Berg while the two spoke on the phone, as well as relevant phone records, is without merit. Defendant makes no claim that the phone records or statements made during the conversations were exculpatory. And with respect to his conversations, defendant's claim of "unfair surprise" is undermined by the fact that he was a party to the alleged conversation. Defendant has not shown he is entitled to relief.

Rodea also argues the prosecutor improperly bolstered the credibility of Sean Berg when he stated that Berg had not been charged in an unrelated case in Bay County at the time he was initially questioned by the police, and thus did not have any motivation to lie to get better treatment in that case. During closing argument in this second trial, the prosecutor spoke of Berg's testimonial immunity in the instant case, as well as other considerations Berg would likely receive for a case in Bay County. The prosecutor then stated that this consideration was offered after Berg made his statements during the police's initial interview of him. This statement did not imply that the prosecutor had special knowledge of Berg's veracity and is not improper.

Rodea finally argues that the prosecutor improperly placed an autopsy photograph of the victim on the projector screen during closing arguments. However, as the prosecutor notes, defendant has not shown, based on the record, that this actually occurred. Moreover, these photographs had already been entered into evidence. Defendant cannot show any error requiring reversal.

## D. INEFFECTIVE ASSISTANCE

Defendant Rodea raises a number of claims of ineffective assistance of counsel. As to the first, defense counsel did not provide ineffective assistance by deciding not to object to the alleged instances of prosecutor misconduct, as no misconduct occurred.

Rodea also argues that counsel failed to present a substantial defense, or to properly investigate. Defendant is correct that "[a] defendant is entitled to have his counsel prepare, investigate, and present all substantial defenses," which are those that might have made a difference in the outcome. *People v Kelly*, 186 Mich App 524, 526; 465 NW2d 569 (1990). However, "[d]ecisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy, and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy." *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002).

Here, as noted by plaintiff, defense counsel's strategy was that Rodea was not present during the shooting, but was instead passed out in Rembish's home where he had returned following the initial altercation at the bar. That this strategy did not work did not render its use ineffective assistance of counsel. *People v Petri*, 279 Mich App 407, 412; 760 NW2d 882 (2008).

In addition, while defendant faults counsel for allegedly making no objections to "anything" or to present any defense, defendant provides no particulars, other than with respect to the alleged prosecutor misconduct. Defendant has thus abandoned any other claim of error concerning his defense strategy. *Prince*, 237 Mich App at 197; *Peterson Novelties, Inc*, 259 Mich App at 14.

E. NEW TRIAL

Defendant Rodea lastly argues that the trial court abused its discretion when it refused to grant Rodea's motion for a separate trial. This Court reviews a trial court's ultimate decision on a motion to sever the trials of codefendants for an abuse of discretion. *People v Hana*, 447 Mich 325, 346; 524 NW2d 682 (1994). A defendant does not have an absolute right to a separate trial. *Hoffman*, 205 Mich App at 20. Rather, there exists a strong policy that favors the conduct of joint trials in the interest of justice, judicial economy, and administration. *People v Etheridge*, 196 Mich App 43, 52-53; 492 NW2d 490 (1992). The "joinder of distinct criminal charges" is permissible against multiple defendants when "(1) there is a significant overlapping of issues and evidence, (2) the charges constitute a series of events, and (3) there is a substantial interconnectedness between the parties defendant, the trial proofs, and the factual and legal bases of the crimes charged." *People v Missouri*, 100 Mich App 310, 349; 299 NW2d 346 (1980). "Moreover, even the improper joining of defendants for trial under separate offenses is not per se reversible error." *Id*. Severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Hana*, 447 Mich at 359-360 (internal quotation marks and citation omitted).

A trial court is permitted to sever joined charges "when appropriate to promote fairness to the parties and a fair determination of the defendant's guilt or innocence." MCR 6.120(B). However, under MCR 6.120(C), the trial court is required to sever charges that are unrelated, as defined by MCR 6.120(B)(1). MCR 6.120(B) provides, in pertinent part:

(1) Joinder is appropriate if the offenses are related. For purposes of this rule, offenses are related if they are based on

-14-

(a) the same conduct or transaction, or

(b) a series of connected acts, or

(c) a series of acts constituting parts of a single scheme or plan.

(2) Other relevant factors include the timeliness of the motion, the drain on the parties' resources, the potential for confusion or prejudice stemming from either the number of charges or the complexity or nature of the evidence, the potential for harassment, the convenience of witnesses, and the parties' readiness for trial.

In contrast, severance is mandated under MCR 6.121(C) only when a defendant is able to clearly and affirmatively demonstrate, by an affidavit or offer of proof, that his substantial rights will be prejudiced by the conduct of a joint trial, and that severance is the required method to rectify the potential prejudice. *Hana*, 447 Mich at 345-346.

Joinder in the instant case was generally appropriate under MCR 6.120(B)(1) because the actions alleged all stemmed from the same incident, the shootings that occurred at the Corner Lounge and the Maple Gardens bar. The trial involved numerous witnesses who would have had to testify to the same thing twice and also involved other virtually identical evidence regarding the crimes. To hold separate trials would have been duplicative and excessive. See *Etheridge*, 196 Mich App at 52.

To require severance, it must be demonstrated that the defenses are both inconsistent and mutually exclusive or irreconcilable. *People v Cadle (On Remand)*, 209 Mich App 467, 469; 531 NW2d 761 (1995). A mere allegation that a codefendant's defense is "antagonistic" is inadequate; the defenses must be so antagonistic to the codefendants that the defenses are mutually exclusive. *Hana*, 447 Mich at 350. Defenses are defined as being mutually exclusive "if the jury, in order to believe the core of the evidence offered on behalf of one defendant, must disbelieve the core of the evidence offered on behalf of the codefendant." *Id*. (internal quotation marks and citation omitted). Here, Rodea argued that severance was necessary because he planned on testifying that he did not have possession of his cell phone at the time of the shooting, but rather Rembish did. Rodea maintained that this would result in incompatible defenses, where each would claim that the other had possession of the phone, and would substantially prejudice Rodea.

However, Rodea's defense did not hinge on possession of the cell phone, but on a claim that he was not present at the shootings. At one point, Rodea admitted that he had the phone with him that evening. He did not state at any point that he somehow lost it. During closing arguments, defense counsel simply stated that the prosecution had not presented any evidence as to who was using Rodea's phone or what was talked about. Rembish's counsel made even less mention of this evidence, focusing on the lack of specificity of location evidence in general. This phone record evidence, while supporting a finding that Rodea committed the crimes with Rembish, was not so essential that it constituted "core" evidence so as to require separate trials.

-15-

Affirmed.

/s/ Christopher M. Murray
/s/ Peter D. O'Connell
/s/ Stephen L. Borrello