*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DARYL CONNER,

        Defendant-Appellant.

UNPUBLISHED
December 17, 2019

No. 343286
Oakland Circuit Court
LC No. 2017-261380-FC

Before: BECKERING, P.J., and BORRELLO and M. J. KELLY, JJ.

PER CURIAM.

Defendant was convicted by a jury of first-degree felony murder, MCL 750.316(1)(b), and possession of a firearm during the commission of a felony, MCL 750.227b. The trial court sentenced defendant to life imprisonment without the possibility of parole for the murder conviction, and a consecutive two-year term of imprisonment for the felony-firearm conviction. Defendant appeals by delayed leave granted. For the reasons set forth in this opinion, we affirm the convictions and sentences of defendant.

## I. BACKGROUND

On the afternoon of August 31, 2016, defendant and his friends, Cordai Wallace and Deshawn Jones, were walking to a basketball court in a neighborhood in Pontiac, Michigan. As they were proceeding to the basketball court, an individual later identified as Jesson Iglesias approached defendant, pulled eight dollars out of his pocket and asked to buy some marijuana. According to Wallace, defendant took Iglesias' money and the entire group ran away, with Iglesias in pursuit yelling at defendant to give him back his money. Wallace testified that as they ran away, he heard two gunshots, looked back and saw defendant running toward him with a gun in his hand. Iglesias later died from a gunshot wound to the chest.

Wallace testified that after hearing the shots, he and Jones ran in a different direction than defendant. At some point Jones called his cousin, Breanna Hughes, to come and get him and Wallace. When her car arrived at the spot where Jones and Wallace had run to, Wallace noted that defendant was already in the car. Hughes then dropped the three off at a party store.

A woman who was babysitting her grandchildren near where the shooting occurred, testified that she saw a group of four people walking down the street. The group consisted of three black males, between the ages of 18 and 22, and one Hispanic male, who was "35, 40 maybe." The three black males were walking ahead of the Hispanic man, later identified as Iglesias. One of the black males turned and pointed a gun at Iglesias. A few seconds later, she heard two gunshots. The gunman put the gun back in his pocket, continued walking, and Iglesias followed him. At that time, it did not appear to the witness that Iglesias had been shot because he continued to walk behind the group.[1] The women briefly lost sight of the group because of a tree. Approximately five minutes later, she saw Iglesias coming back down the street, "covered in blood," and realized he had been shot. When she and others[2] approached him, Iglesias stated: "They done shot me in my heart."

The neighbor went to the police station on August 31, 2016, where she was shown several photographic arrays, and selected Jones as resembling the person who pointed the gun at Iglesias. At trial, she testified that she was not sure that she selected the right person, stating she was focused more on the gun than on their faces.

Detective Maurice Martin testified that he and his partner, Detective Dawn Mullins, investigated the case and interviewed defendant on November 11, 2016. After waiving his *Miranda*[3] rights, defendant gave a statement to the police, which was videotaped and played for the jury. Martin testified that defendant first denied having any knowledge of the shooting, stating that he was walking with two other individuals, talking on his phone, heard gunshots, and ran. After Martin inquired of defendant how he would know "exactly where the area was that the victim was hit" if he ran after hearing the gunshots, defendant "paused and he stated that he was the person who actually shot Mr. Iglesias." Defendant stated that as he and his two friends were walking down the street, Iglesias approached them, and Jones told defendant to take Iglesias's wallet. Defendant took the wallet and ran, and Iglesias ran after him. Some items fell out of defendant's pocket, he stopped to pick them up, and Iglesias was catching up to him causing defendant to fear "that . . . Iglesias was going to do something to him and he fired the shots." Defendant stated that he got the gun from Jones.

A jury convicted defendant as stated above. Defendant now appeals by delayed leave granted.

II. ANALYSIS

---

[1] An Oakland County Sheriff's crime scene investigator testified that he found a fired .380 cartridge case and a blood trail from that point that continued past a nearby barbershop. A video from the barbershop surveillance camera was admitted into evidence at trial and played for the jury.

[2] Another female testified that, as she was driving to work, she saw a wounded man and called the police. A male neighbor testified that after hearing gunshots, he observed a man who had been shot "going back and forth" down the street.

[3] *Miranda v Arizona,* 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

# I. GREAT WEIGHT OF THE EVIDENCE

On appeal, defendant first contends that the prosecution's evidence establishing his identity as the shooter was so inconsistent and incredible that the jury's verdict is against the great weight of the evidence and it would be a miscarriage of justice and a denial of his due process rights to allow the verdict to stand. Defendant raised this issue in a motion for a new trial, which the trial court denied.

We review a trial court's decision denying a motion for a new trial for an abuse of discretion. *People v Abraham*, 256 Mich App 265, 269; 662 NW2d 836 (2003). A new trial may be granted if a verdict is against the great weight of the evidence. MCR 2.611(A)(1)(e). In evaluating whether a verdict is against the great weight of the evidence, the question is whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand. *People v Lemmon*, 456 Mich 625, 627; 576 NW2d 129 (1998); *People v Unger*, 278 Mich App 210, 232; 749 NW2d 272 (2008). A verdict should be vacated only when it "does not find reasonable support in the evidence, but is more likely to be attributed to causes outside the record such as passion, prejudice, sympathy, or some extraneous influence." *People v DeLisle*, 202 Mich App 658, 661; 509 NW2d 885 (1993) (citation omitted). Absent compelling circumstances, the credibility of witnesses is for the jury to determine. See *Lemmon,* 456 Mich at 642-643.

Identity is an essential element in a criminal prosecution, *People v Oliphant*, 399 Mich 472, 489; 250 NW2d 443 (1976), and the prosecution must prove the identity of the defendant as the perpetrator of a charged offense beyond a reasonable doubt. *People v Kern*, 6 Mich App 406, 409-410; 149 NW2d 216 (1967). Positive identification by a witness or circumstantial evidence and reasonable inferences arising from it may be sufficient to support a conviction. *People v Davis*, 241 Mich App 697, 700; 617 NW2d 381 (2000); *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). The credibility of identification testimony is for the trier of fact to resolve and this Court will not resolve it anew. *Davis*, 241 Mich App at 700.

In seeking to have this Court hold that the verdict was against the great weight of the evidence, defendant directs us to the neighbor's identification of Jones as the shooter. Further, defendant argues that the same witness testified that the shooter wore dark clothes, but on the date and time of the shooting defendant was wearing a white t-shirt and black-and-white gym shorts. Additionally, defendant argues, Jones was approached as the drug dealer, and until Martin told defendant that he did not believe him, defendant's statements to police were similar to those of other eyewitnesses. Additionally, defendant vociferously argues that Wallace never testified that he actually saw defendant shoot the victim. However, defendant's arguments ignore a majority of the record. The record reveals that numerous people observed that Iglesias had been shot. Wallace, a friend of defendant, and someone whom defendant admitted he was with on the day of the shooting, testified that defendant took money from the victim and then as they began to run away from the victim, Wallace heard gun shots, turned around and saw defendant with a gun in his hand. Defendant admitted to police that he took the victim's wallet. Defendant admitted to police that he ran from the victim because he had taken the victim's wallet. Defendant also admitted to police that he shot the victim as the victim was catching up to defendant.

While we recognize the inconsistencies defendant argues in his brief on appeal, we cannot find that any of these inconsistencies render any testimony inherently implausible. Additionally, all of the alleged inconsistences were presented to the jury. Our Supreme Court has made clear that in cases where a jury is confronted with inconsistent and impeached testimony, it is not for this Court to act as a 13th juror. See, *Lemmon*, 456 Mich at 640 ("…the thirteenth juror approach has a potential to undermine the jury function and why we now reject it"). Rather, we observe as a cornerstone of our jurisprudence that in matters wherein conflicting testimony is presented, that: "in general conflicting testimony or a question as to the credibility of a witness are not sufficient grounds for granting a new trial," *Lemon*, 456 Mich at 643, quoting *United States v Garcia*, 978 F2d 746,748 (CA1, 1992). Our Courts have been clear on this issue as far back as *Anderson v Conterio,* 303 Mich 75, 79; 5 NW2d 572 (1942) when our Supreme Court held that when testimony is in direct conflict and testimony supporting the verdict has been impeached, if: "it cannot be said as a matter of law that the testimony thus impeached was deprived of all probative value or that the jury could not believe it," the credibility of witnesses is for the jury.

Here, after due consideration of the entire record, we concur with the conclusions of the trial court that the contradictions in testimony cited by defendant are not particularly incredible, nor was the complained of testimony inherently implausible such that it could not be believed by a reasonable juror. *Lemmon*, 456 Mich at 644. Essentially, these findings formed the basis for the trial court's denial of defendant's motion for a new trial and we find no error in the trial court's analysis or its conclusions. Accordingly, defendant is not entitled to relief on this issue.

## II. MANDATORY LIFE SENTENCE

Defendant next argues that because he was only 18 years old at the time of the offense, imposition of the statutory sentence of mandatory life imprisonment without the possibility of parole violates the Eighth Amendment "because the mitigating factors of youth should be considered before a court imposes the harshest sentence."

Whether a statute is constitutional is a question of law that this Court reviews de novo. *People v Beam*, 244 Mich App 103, 105; 624 NW2d 764 (2000). "Statutes are presumed to be constitutional, and the party challenging the statute has the burden of showing the contrary." *People v Dillon*, 296 Mich App 506, 510; 822 NW2d 611 (2012). "The Michigan Constitution prohibits cruel *or* unusual punishment, Const 1963, art 1, § 16,[4] whereas the United States Constitution prohibits cruel *and* unusual punishment, U.S. Const. Am. VIII.[5]" *People v Benton*, 294 Mich App 191, 204; 817 NW2d 599 (2011). "If a punishment passes muster under the state constitution, then it necessarily passes muster under the federal constitution." *Id.* (citation and

---

[4] The Michigan Constitution provides, "cruel or unusual punishment shall not be inflicted[.]" Const 1963, art 1, § 16.

[5] The Eighth Amendment of the United States Constitution provides, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." US Const, Am VIII.

quotation marks omitted). Whether a penalty or sentence imposed against a defendant can be considered cruel or unusual is to be determined by a three-pronged test including: "(1) the severity of the sentence imposed and the gravity of the offense, (2) a comparison of the penalty to penalties for other crimes under Michigan law, and (3) a comparison between Michigan's penalty and penalties imposed for the same offense in other states." *Id.* (citation omitted).

The Legislature has mandated a sentence of life imprisonment without the possibility of parole for adult offenders who commit the crime of first-degree murder. MCL 750.316. In *People v Hall*, 396 Mich 650, 657-658 (1976); 242 NW2d 377 (1976), our Supreme Court upheld this mandated life sentence for felony murder, under both the United States and Michigan Constitutions. Our Supreme Court expressly rejected the defendant's assertions that a mandatory life sentence under MCL 750.316 violated both US Const, Am VIII, prohibiting "cruel and unusual" punishment, and Const 1963, art 1, § 16, forbidding "cruel or unusual" punishment. The Court found that "the punishment exacted is proportionate to the crime," that no indication existed that "Michigan's punishment is widely divergent from any sister jurisdiction," and that the sentence served the Legislature's permissible goal to deter similar conduct by others. *Hall*, 396 Mich at 658. "Legislatively mandated sentences are presumptively proportional and presumptively valid." *People v Brown*, 294 Mich App 377, 390; 811 NW2d 531 (2011). "[A] proportionate sentence does not constitute cruel or unusual punishment." *People v Powell*, 278 Mich App 318, 323; 750 NW2d 607 (2008).

We concur with defendant that the United States Supreme Court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " *Miller v Alabama*, 567 US 460, 465; 132 S Ct 2455; 183 L Ed 2d 407 (2012). In *Miller*, the Court concluded that such mandatory sentencing "prevents those meting out punishment from considering a juvenile's 'lessened culpability' and greater 'capacity for change,' *Graham v Florida*, 560 US 48, 68, 74; 130 S Ct 2011; 176 L Ed 2d 825 (2010), and runs afoul of our cases' requirement of individualized sentencing for defendants facing the most serious penalties." *Miller*, 567 US at 465. The issue, however, is whether *Miller* is applicable here. Defendant does not dispute that at the time the murder was committed he was over the age of 18. Having been over the age of 18 at the time of the commission of the crime, we find *Miller* and *Graham* inapplicable.

Defendant also argues that scientific studies support that the same basis the Supreme Court applied in *Miller* and *Graham* to hold mandatory life without parole sentences unconstitutional applies to 18-year-old offenders, like defendant, whose brains are continuing to mature. Again, defendant is not a member of that class of individuals addressed in *Miller* and *Graham*. While we understand the argument advanced by defendant, that for social scientists youth is an ever-evolving concept, at their core, defendant's arguments are merely an attempt to have this Court expand *Miller* and *Graham* beyond their holdings. Notably, the Supreme Court's decisions in *Graham* and *Miller* are rooted in that Court's prior decision in *Roper v Simmons*, 543 US 551, 574; 125 S Ct 1183; 161 L Ed 2d 1 (2005), in which the Court stated:

> Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never

reach. For the reasons we have discussed, however, a line must be drawn. The plurality opinion in *Thompson* [*v Oklahoma*, 487 US 815; 108 S Ct 2687; 101 L Ed 2d 702 (1988),] drew the line at 16. In the intervening years the *Thompson* plurality's conclusion that offenders under 16 may not be executed has not been challenged. The logic of *Thompson* extends to those who are under 18. The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest.

Accordingly, the Eighth Amendment does not bar Michigan from imposing a mandatory sentence of life without parole on offenders who commit first-degree murder after reaching the age of 18. Therefore, we reject defendant's claim that he is entitled to a "*Miller* hearing."

### III. DEFENDANT'S STANDARD 4 BRIEF

In a pro se supplemental brief filed pursuant to Supreme Court Administrative Order No. 2004-6, Standard 4, defendant argues that he was denied his constitutional right to a properly instructed jury because the verdict form did not provide the jury with a general "not guilty" option, and did not allow the jury the opportunity to find him not guilty of the lesser offense of second-degree murder. We review this unpreserved claim of instructional error for plain error affecting defendant's substantial rights. *People v Carines*, 460 Mich 750, 752-753, 763-764; 597 NW2d 130 (1999).

Due process requires that the trial court "properly instruct the jury so that it may correctly and intelligently decide the case." *People v Clark*, 453 Mich 572, 584-585; 556 NW2d 820 (1996) (citations omitted). Defendant correctly observes that "a criminal defendant is deprived of his constitutional right to a jury trial when the jury is not given the opportunity to return a general verdict of not guilty." *People v Wade*, 283 Mich App 462, 467; 771 NW2d 447 (2009). However, that is not what occurred here. In this case, the verdict form provided the jury with the following three options for the first-degree felony-murder count:

    \_\_\_\_Not Guilty

    \_\_\_\_Guilty of Homicide - First Degree Felony Murder

    \_\_\_\_Guilty of the lesser offense of Second Degree

Relative to this case, the verdict form specifically allowed the jury to select a general "Not Guilty" verdict regarding the felony-murder charge. The trial court also instructed the jury that one of the available options for the felony-murder charge was "not guilty" and to "return only one verdict on each count." The jury convicted defendant of the highest offense, first-degree felony murder. Accordingly, defendant's unpreserved challenge to the jury verdict form

does not warrant relief.

Affirmed.

/s/ Jane M. Beckering
/s/ Stephen L. Borrello
/s/ Michael J. Kelly